1
 2025 CO 28
The People of the State of Colorado, Petitioners In the Interest of Minor Child: B.C.B.; and B.C.B., v. A.B. and J.S. Respondents No. 24SC539
Supreme Court of Colorado, En Banc
May 27, 2025
 2
 
          
 Certiorari to the Colorado Court of Appeals Court of Appeals
 Case No. 23CA1316.
 
 
          
 Attorneys for Petitioner the People of the State of Colorado:
 Office of the El Paso County Attorney Kenneth Hodges, County
 Attorney Colorado Springs, Colorado.
 
 
          
 Melanie Douglas LLC Melanie Douglas Colorado Springs,
 Colorado.
 
 3
 
          
 Attorney for Petitioner B.C.B.: Josi McCauley, guardian ad
 litem Superior, Colorado.
 
 
          
 Attorneys for Respondent A.B.: Schmitz Law LLC Amanda Schmitz
 Denver, Colorado.
 
 
          
 Attorney for Respondent J.S.: Michael Kovaka Littleton,
 Colorado.
 
 
          
 Attorneys for Amicus Curiae Colorado Department of Human
 Services: Philip J. Weiser, Attorney General Russell D.
 Johnson, Deputy Solicitor General Nicole Chaney, Assistant
 Attorney General Denver, Colorado.
 
 
          
 Attorney for Amici Curiae Elephant Circle, Harm Reduction
 Action Center, and Soul 2 Soul Sisters: Indra Lusero
 Palisade, Colorado.
 
 
          
 Attorney for Amicus Curiae Office of the Child's
 Representative: Anna N. Ulrich Denver, Colorado.
 
 
          
 Attorney for Amicus Curiae Office of Respondent Parents'
 Counsel: Christine Van Gaasbeek Denver, Colorado.
 
 
          
 Attorneys for Amicus Curiae Pregnancy Justice: Karen Thompson
 New York, New York Kyriaki Council Denver, Colorado.
 
 4
 
          
 JUSTICE GABRIEL delivered the Opinion of the Court, in which
 JUSTICE BOATRIGHT, JUSTICE HOOD, JUSTICE HART, and JUSTICE
 BERKENKOTTER joined. CHIEF JUSTICE MÁRQUEZ, joined by
 JUSTICE SAMOUR, dissented.
 
 5
 
          
 OPINION
 
 
          
 GABRIEL, JUSTICE.
 
 
          ¶1
 This dependency or neglect action, in which the El Paso
 County Department of Human Services (the
 "Department") and the guardian ad litem
 ("GAL") for the child, B.C.B., challenge the court
 of appeals division's judgment reversing a dependency or
 neglect adjudication, requires us to construe section
 19-3-102(1)(g), C.R.S. (2024). That statute provides that a
 child is dependent or neglected if "[t]he child is born
 affected by alcohol or substance exposure, except when taken
 as prescribed or recommended and monitored by a licensed
 health care provider, and the newborn child's health or
 welfare is threatened by substance use."
 Id.[1]
 
 
          ¶2
 We now conclude, contrary to the division majority's
 determination, that a child is born affected by alcohol or
 substance exposure within the meaning of section
 19-3-102(1)(g) when, as here, the child tests positive at
 birth for methamphetamine. This alone, however, does not
 suffice to establish that the
 
 6
 
 child was dependent or neglected because the statute further
 requires that the Department prove that "the newborn
 child's health or welfare is threatened by substance
 use." Id. The Department satisfies this prong
 of the statute if it shows either that (1) exposure to a
 particular substance directly threatens a child's health
 or welfare; or (2) as a result of a parent's substance
 use, the parent would be unable to care for the child
 properly. Applying this construction of the statute here, we
 conclude that sufficient evidence supported the jury's
 finding that B.C.B. was dependent or neglected.
 
 
          ¶3
 Accordingly, we reverse the judgment of the division below.
 
 
          I.
 Facts and Procedural History
 
 
          ¶4
 B.C.B. was born in a car in which his mother and father were
 living. After B.C.B. and mother were transported by ambulance
 to a hospital, B.C.B.'s urine and umbilical cord tested
 positive for amphetamines and methamphetamine. Mother also
 tested positive for methamphetamine, although she initially
 denied knowingly using methamphetamine during her pregnancy.
 
 
          ¶5
 Due to B.C.B.'s positive methamphetamine test, the
 Department brought in an intake caseworker to conduct a
 safety assessment to determine whether B.C.B. was at risk.
 Concluding that the impact on B.C.B. was so significant that
 it caused him harm, the Department sought and was granted a
 court order allowing it to
 
 7
 
 take temporary custody of B.C.B., and he was placed with
 caregivers upon his release from the hospital.
 
 
          ¶6
 The Department then filed a petition alleging that B.C.B. was
 dependent or neglected pursuant to various sections of
 19-3-102. Initially, the whereabouts of B.C.B.'s father
 were unknown, and the matter was set for a jury trial at
 mother's request. Thereafter, father entered an
 appearance, the trial was reset for both parents, and the
 case proceeded to an adjudicatory trial in the El Paso County
 District Court.
 
 
          ¶7
 At trial, contrary to her previous denial, mother admitted
 using methamphetamine during her pregnancy with B.C.B. She
 further testified that she did not have much prenatal care, a
 primary care doctor, or an ob-gyn, although during her
 pregnancy, she went to a pregnancy center, where she had a
 couple of ultrasounds.
 
 
          ¶8
 Also at trial, three of B.C.B.'s pediatricians testified.
 Specifically, Dr. Anna Lawrence testified that in the days
 after B.C.B.'s birth, he had some problems with latching
 to breastfeed. Dr. Lawrence opined that this issue could have
 been drug-related, although it also could have been
 attributable to a newborn baby's struggling to learn how
 to eat. Dr. Lawrence further testified that, due to
 B.C.B.'s methamphetamine exposure, he is at risk of
 developing attention deficit
 
 8
 
 hyperactivity disorder and cognitive, behavioral, and motor
 skill difficulties. Accordingly, in Dr. Lawrence's view,
 he should be monitored.
 
 
          ¶9
 Dr. Stephanie Lombardi then testified that B.C.B.'s
 caregiver had reported to her that B.C.B. was experiencing
 tremors and was sweating and easily startled. Although Dr.
 Lombardi did not personally observe these behaviors during
 B.C.B.'s appointments, she noted that some of these
 symptoms have been linked to methamphetamine withdrawal. Dr.
 Lombardi further testified that it was "very
 important" that B.C.B. be closely followed to make sure
 that he does not experience developmental delays or other
 concerning symptoms that might arise over time.
 
 
          ¶10
 B.C.B.'s primary care pediatrician, Dr. Heather Welfare,
 followed, and she testified that B.C.B. seemed to be doing
 "very well" after experiencing an episode of
 bronchiolitis. Dr. Welfare also opined that methamphetamine
 exposure in utero was "medically significant" and
 that B.C.B. should be monitored for cognitive and
 developmental effects because some studies have shown such
 effects from methamphetamine exposure.
 
 
          ¶11
 Although all of these doctors noted potential risks from
 prenatal methamphetamine exposure, none of them could say
 whether B.C.B. would actually experience any future effects
 from his exposure. This is because methamphetamine exposure
 is one of the less studied forms of in utero exposure
 
 9
 
 and evidence in the medical literature on its effects is thus
 far conflicting. Accordingly, as Dr. Welfare put it, the
 risks to B.C.B. from his exposure are, at this point,
 possibilities and not probabilities.
 
 
          ¶12
 The intake caseworker assigned to this matter also testified.
 She reported that mother had told her that mother had some
 undiagnosed mental health issues, including intermittent
 explosive anger issues. Mother also noted that she had
 experienced a traumatic brain injury several years before,
 that this injury might affect her cognitive processing, and
 that she self-medicates. And mother told the caseworker that
 she and father were living in a car because they had been
 evicted from her parents' home a month prior to
 B.C.B.'s birth, due in part to mother's "anger
 explosive situation."
 
 
          ¶13
 This caseworker also described how a child's health and
 welfare can be threatened by a caregiver's use of
 substances:
 
 
 [I]f a caregiver is using substances and has a potentiality
 to have out of control behavior or not able to make the
 appropriate decisions . . . as a child being zero to three,
 they are vulnerable. They do not know how to speak and they
 are dependent on a caregiver. If a caregiver is intoxicated
 or under the use of-under the influence of any substances, it
 puts a great deal of risk for the child to be harmed or hurt
 or-or something more severe.
 
 
          ¶14
 Lastly, mother's therapist testified that although mother
 had been participating in substance abuse treatment and
 therapy, she should not be discharged from such services
 because she was still working on implementing
 
 10
 
 changes in her life and the therapist wanted more consistency
 and stability. Specifically, the therapist observed that
 mother had not yet been cured in her recovery and was still
 working on having a sober lifestyle in place and establishing
 the skills and knowledge to implement relapse prevention
 without external supports. In addition, the therapist noted
 that one of mother's biggest triggers is being
 overwhelmed and stressed out, and a significant concern for
 the therapist was to help support mother to reduce those
 triggers if she were to have B.C.B. in her home in the
 future.
 
 
          ¶15
 The jury ultimately returned a verdict finding that B.C.B.
 was born affected by substance exposure and that his health
 or welfare was threatened by substance use. The trial court
 thus entered an adjudication of dependency or neglect,
 ordered that custody of B.C.B. continue with the Department,
 and further ordered treatment staffing for mother.
 
 
          ¶16
 The parents then appealed. As pertinent here, mother argued
 that the department had not produced sufficient evidence to
 support B.C.B.'s adjudication under section
 19-3-102(1)(g). People in Int. of B.C.B., 2024 COA
 88, ¶ 22, 558 P.3d 980, 985.
 
 
          ¶17
 In a divided, published opinion, a division of our court of
 appeals agreed with mother and reversed the trial court's
 adjudication. Id. at ¶¶ 2, 34, 558 P.3d at
 983, 988. Relying on (1) the 2020 amendment to section
 19-3-102(1)(g), which
 
 11
 
 replaced the prior statutory language that had provided that
 a positive drug test alone established that a child was
 dependent or neglected; and (2) regulations adopted by the
 State Board of Human Services defining the terms in the
 amended version of the statute, the majority concluded that
 to secure an adjudication under section 19-3-102(1)(g), the
 Department "must establish that, at birth, the child was
 adversely affected by-rather than merely exposed to-alcohol
 or substances." Id. at ¶¶ 2, 17-21,
 558 P.3d at 983-85. Applying this construction to the facts
 before it, the majority concluded that the Department had not
 presented evidence sufficient to support a conclusion, by a
 preponderance of the evidence, that B.C.B. had suffered a
 physical, developmental, or behavioral response to substance
 exposure, and, thus, the evidence did not support
 B.C.B.'s adjudication as dependent or neglected.
 Id. at ¶¶ 2, 34, 558 P.3d at 983, 988.
 
 
          ¶18
 In so ruling, the majority reasoned that, under the statute,
 B.C.B.'s positive test at birth for methamphetamine was
 insufficient, by itself, to establish dependency or neglect
 and that the Department did not otherwise prove that
 B.C.B.'s in utero exposure impacted his physical,
 developmental, or behavioral response. Id. at
 ¶¶ 25-33, 558 P.3d at 986-88. As the majority saw
 it, at best, the Department had presented evidence that
 B.C.B. might suffer long-term impacts due to the
 substance exposure, but "[a]n adjudication cannot be
 premised on conjecture or speculation." Id. at
 ¶ 30, 558 P.3d at 987. Nor was the majority
 
 12
 
 persuaded by the evidence that B.C.B. had initial difficulty
 latching to feed and that a caretaker had observed tremors
 and similar symptoms. Id. at ¶¶ 31-32, 558
 P.3d at 987-88. This was because none of B.C.B.'s doctors
 were able to attribute these symptoms to the methamphetamine
 exposure. Id.
 
 
          ¶19
 Judge Fox dissented. In her view, section
 19-3-102(1)(g)'s plain language did not require the
 Department to present evidence of immediate impacts caused by
 B.C.B.'s in utero exposure. Id. at ¶ 35,
 558 P.3d at 988 (Fox, J., dissenting). Rather, it was enough,
 under a preponderance of the evidence standard, that Dr.
 Lombardi had associated B.C.B.'s tremors with withdrawal
 symptoms. Id. at ¶ 37, 558 P.3d at 989.
 
 
          ¶20
 Specifically, Judge Fox disagreed with the majority's
 determination that the statute required the Department to
 present evidence that exposure to methamphetamine caused an
 immediate, harmful effect on B.C.B. Id. at ¶
 46, 558 P.3d at 990. Rather, the word "affect"
 meant simply to produce an effect on someone or something,
 and here, B.C.B.'s positive test was the effect of his in
 utero exposure. Id. Accordingly, Judge Fox proceeded
 to the statute's second prong, and she concluded that
 because (1) Dr. Lombardi had connected B.C.B.'s tremors
 to prenatal exposure, (2) mother still required treatment for
 her substance abuse issues, and (3) the evidence did not show
 that either parent was in a position to care safely for
 B.C.B. as of the time of the adjudicatory trial, the
 Department had
 
 13
 
 sufficiently established that B.C.B.'s health or welfare
 was threatened by substance abuse. Id. at
 ¶¶ 51-54, 558 P.3d at 991-92.
 
 
          ¶21
 The Department and the GAL then filed petitions for writs of
 certiorari, and we granted both petitions.
 
 
          II.
 Analysis
 
 
          ¶22
 We begin by setting forth the applicable standard of review
 and principles of statutory construction. Next, we address
 the proper construction of section 19-3-102(1)(g), and we
 discuss the deference, if any, that we must afford the agency
 regulations defining key terms in that statute. We then apply
 our construction to the case before us, ultimately concluding
 that sufficient evidence allowed the jury to conclude, by a
 preponderance of the evidence, that B.C.B. was dependent or
 neglected.
 
 
          A.
 Standard of Review and Principles of Statutory Construction
 
 
          ¶23
 In determining whether sufficient evidence supported a jury
 verdict of dependency or neglect, we view the record in the
 light most favorable to the party that succeeded at trial,
 and we draw every inference fairly deducible from the
 evidence in favor of the judgment. People in Int. of
 D.L.R., 638 P.2d 39, 41 (Colo. 1981).
 
 
          ¶24
 In contrast, we review questions of statutory interpretation
 de novo. In re People in Int. of C.J.T.,
 2023 CO 60, ¶ 40, 546 P.3d 1150, 1158. When interpreting
 
 14
 
 statutes, we seek to discern and effectuate the
 legislature's intent. Id. In doing so, we apply
 words and phrases according to their plain and ordinary
 meanings, and we consider the entire statutory scheme to give
 consistent, harmonious, and sensible effect to all of its
 parts. Id. In addition, we must avoid constructions
 that would render any statutory words or phrases superfluous
 or that would lead to illogical or absurd results.
 Id.
 
 
          ¶25
 In construing a statute, we must respect the
 legislature's choice of language. UMB Bank, N.A. v.
 Landmark Towers Ass'n, 2017 CO 107, ¶ 22, 408
 P.3d 836, 840. As a result, we may not add words to a statute
 or subtract words from it. Id.
 
 
          ¶26
 If the statutory language is unambiguous, then we apply it as
 written, and we need not resort to other rules of statutory
 construction. C.J.T., ¶ 41, 546 P.3d at 1158.
 
 
          ¶27
 In conducting our statutory analysis, we may consider an
 administrative agency's interpretation of the statute,
 but we are not bound by this interpretation, and we will not
 defer to it if it conflicts with the statute's plain
 language. Dep't of Revenue v. Agilent
 Techs., Inc., 2019 CO 41, ¶ 16, 441 P.3d 1012,
 1016-17.
 
 
          B.
 Section 19-3-102(1)(g)
 
 
          ¶28
 As noted above, prior to its amendment in 2020, section
 19-3-102(1)(g) provided that a child was dependent or
 neglected if the child "tests positive at birth for
 either a schedule I controlled substance . . . or a schedule
 II controlled
 
 15
 
 substance." Ch. 186, sec. 5, § 19-3-102(1)(g), 2020
 Colo. Sess. Laws 852, 854. This language established a
 one-factor test: if a child tested positive at birth, then
 the child was dependent or neglected.
 
 
          ¶29
 In 2020, however, the legislature amended section
 19-3-102(1)(g). This amendment was enacted as part of S.B.
 20-028, which was entitled, "An Act Concerning Measures
 to Assist an Individual's Recovery From a Substance Use
 Disorder." Ch. 186, 2020 Colo. Sess. Laws 852, 852. As
 the bill's title reflects, the amendment was intended to
 deemphasize the focus on a child's positive test at birth
 and to shift the focus to a holistic assessment of the
 family's needs and strengths. Hearing on S.B. 028 before
 the S. Comm. on Health & Hum. Servs., 72d Gen. Assemb.,
 2d Sess. (Jan. 30, 2020) (statement of Jade Woodard).
 
 
          ¶30
 Toward those ends, the amended version of section
 19-3-102(1)(g) now provides that a child is neglected or
 dependent if "[t]he child is born affected by alcohol or
 substance exposure, except when taken as prescribed or
 recommended and monitored by a licensed health care provider,
 and the newborn child's health or welfare is threatened
 by substance use." Accordingly, to establish that a
 child is dependent or neglected under this provision, the
 Department must now satisfy a two-factor test: (1) the child
 must be born affected by alcohol or substance exposure and
 (2) the child's health or welfare must be threatened by
 substance use.
 
 16
 
          ¶31
 This case requires us to construe both "affected by
 alcohol or substance exposure" and "threatened by
 substance use." Although the legislature did not define,
 and we have not yet had occasion to define, either phrase, we
 view these phrases to be unambiguous.
 
 
          ¶32
 Webster's Third New International Dictionary defines
 "affect," in pertinent part, as "to produce an
 effect (as of disease) upon . . ." and "to have a
 detrimental influence on . . . ." Affect,
 Webster's Third New International Dictionary (2002).
 Black's Law Dictionary similarly defines
 "affect," in pertinent part, as "to produce an
 effect on; to influence in some way." Affect,
 Black's Law Dictionary (12th ed. 2024). Accordingly,
 "affected by alcohol or substance exposure"
 requires only a showing that alcohol or substance exposure
 has had an effect on a newborn child. In our view, the
 presence of illicit substances in a newborn child's body
 due to a mother's use of such substances is plainly an
 effect of mother's use.
 
 
          ¶33
 In so construing this language, we acknowledge that the State
 Board of Human Services has adopted a regulation that
 provides, "A child is born affected by alcohol or
 substance exposure when it impacts the child's physical,
 developmental, and/or behavioral response." Dep't of
 Hum. Servs., 12 Colo. Code Regs. 2509-1:7.000.2(A) (2025). As
 noted above, however, we are not bound by regulations that we
 deem inconsistent with the plain meaning of the statute, and
 for the reasons set forth above, we do not interpret
 "affected by" to require
 
 17
 
 that a child be impacted physically, developmentally, or
 behaviorally by exposure to alcohol or illicit substances.
 Accordingly, we conclude that the Board's definition is
 inconsistent with the plain meaning of the words used in the
 statute, and we, therefore, do not follow the Board's
 definition here.
 
 
          ¶34
 Proceeding then to the second prong of the amended version of
 section 19-3-102(1)(g), namely, whether a newborn child's
 health or welfare is threatened by substance use, we conclude
 that under the statute's plain language, a child's
 health or welfare can be "threatened by substance
 use" in two different ways.
 
 
          ¶35
 First, section 19-3-102(1)(g)'s second prong can be
 satisfied by proof that substance use directly threatens a
 newborn child's health or welfare. Thus, this prong would
 be satisfied if the evidence establishes that exposure to a
 given substance is known to create a particular risk to a
 child's health or welfare (i.e., beyond speculation or
 conjecture). In these circumstances, a newborn child's
 health or welfare would plainly be threatened by substance
 use.
 
 
          ¶36
 Second, a newborn child's health or welfare would be
 "threatened by substance use" if, as a result of a
 parent's substance use, the parent would be unable to
 care for the child properly. Such a view is consistent with
 the definition of "threatened by substance use"
 adopted by the State Board of Human Services. Dep't of
 Hum. Servs., 12 Colo. Code Regs. 2509-1:7.000.2(A) (providing
 that a child's health or welfare is threatened by
 substance use "when the medical,
 
 18
 
 physical, and/or developmental needs of the newborn child are
 likely to be inadequately met or parent and/or caregivers are
 likely unable to meet the newborn child's needs").
 This construction is also consistent with the above-noted
 purposes of the 2020 amendments to section 19-3-102(1)(g),
 which were to assist individuals recovering from substance
 use disorders and to change the focus of the analysis from a
 child's positive test at birth, viewed in isolation, to a
 holistic assessment of the family's needs and strengths.
 2020 Colo. Sess. Laws, at 852; Hearing on S.B. 028 (Jan. 30,
 2020) (statement of Jade Woodard).
 
 
          C.
 Application
 
 
          ¶37
 With these principles in mind, we turn to the facts of this
 case and conclude, first, that B.C.B.'s positive test for
 methamphetamine satisfied the first prong of section
 19-3-102(1)(g). As noted above, to establish that prong of
 the statute, the Department was required to show only that
 alcohol or substance exposure had an effect on B.C.B. Here,
 B.C.B.'s positive drug test at birth showed that
 methamphetamine had entered his system, and, in our view,
 this was an obvious effect of his exposure to methamphetamine
 as a result of mother's use of that substance.
 
 
          ¶38
 In reaching this conclusion, we are unpersuaded by
 mother's view and the of the division majority below that
 the amended version of section 19-3-102(1)(g) foreclosed a
 determination that a positive drug test alone could
 
 19
 
 satisfy the first element. As we read the amendment, the
 change in language from its focus on a positive drug test to
 an initial requirement that a child be born affected by
 alcohol or substance exposure reflects a broadening
 of the first element. Whereas before, a positive test was
 necessary, under the current version of the statute, a
 positive test or other circumstances establishing an
 effect of exposure can satisfy the first prong of the
 statute.
 
 
          ¶39
 Nor do we agree that our interpretation of the first
 statutory factor allows for an adjudication of dependency or
 neglect based solely on a positive drug test at birth,
 notwithstanding the fact that the legislature amended section
 19-3-102(1)(g) to alter the prior mandate that a positive
 test alone was sufficient. As noted above, the legislature
 also added a second element that must be proved. Accordingly,
 we perceive no inconsistency between our conclusion that the
 positive drug test here was an effect, on the one hand, and
 the legislature's amendment of section 19-3-102(1)(g), on
 the other.
 
 
          ¶40
 The question thus becomes whether the Department has
 satisfied the second statutory prong, namely, whether
 B.C.B.'s health or welfare is threatened by
 methamphetamine. We conclude that the Department has done so.
 
 
          ¶41
 As noted above, the Department could establish this prong by
 showing either that substance use directly threatened
 B.C.B.'s health or welfare or that, as
 
 20
 
 a result of mother's use of illegal substances, she would
 be unable to care for B.C.B. properly.
 
 
          ¶42
 Here, it is debatable whether the evidence at trial
 established a direct threat to B.C.B.'s future health or
 welfare as a result of his methamphetamine exposure. On the
 one hand, the evidence showed that B.C.B. had trouble
 latching, and his caregiver observed that he exhibited
 tremors, sweating, and a tendency to startle easily, at least
 some of which behaviors could relate to methamphetamine
 exposure or withdrawal. In addition, all three pediatricians
 who testified opined that the future risks to B.C.B. as a
 result of his methamphetamine exposure were significant
 enough to warrant closely monitoring him for cognitive or
 developmental effects. On the other hand, none of these
 doctors could, to a reasonable degree of medical certainty,
 tie the latching difficulty, tremors, sweating, and other
 symptoms to B.C.B.'s methamphetamine exposure. And
 although all three of the doctors opined that prenatal
 methamphetamine exposure could lead to future impacts on
 B.C.B.'s health or welfare, including developmental and
 cognitive problems, none of them could say whether B.C.B.
 would likely experience such impacts. Rather, as Dr. Welfare
 testified, the risks could be described only in terms of
 possibilities, not probabilities.
 
 21
 
          ¶43
 Accordingly, some evidence tended to show that B.C.B.'s
 present and future health and welfare were threatened by
 substance abuse, but other evidence arguably rendered these
 risks speculative.
 
 
          ¶44
 We need not rely solely on this evidence, however, because,
 viewing the evidence in the light most favorable to the
 Department and drawing every fairly deducible inference in
 favor of the jury's verdict, as we must, we conclude that
 ample evidence tended to show that, as a result of
 mother's history of substance abuse, she would be unable
 to care for B.C.B. properly, thus satisfying section
 19-3-102(1)(g)'s second prong. Specifically, as noted
 above, mother's therapist testified that mother should
 not be discharged from substance abuse treatment and therapy
 because she was still working on implementing changes in her
 life and, as a result, was in need of further treatment and
 therapy. Ultimately, the therapist was looking for more
 consistency and stability from mother than mother had yet
 shown. The intake caseworker then testified that a child in
 the first few years of life is vulnerable and dependent on
 the caregiver, and if the caregiver is under the influence of
 any substances, then it creates a great deal of risk for the
 child.
 
 
          ¶45
 In our view, this evidence was sufficient to establish, by a
 preponderance of the evidence, that B.C.B.'s health or
 welfare is threatened by mother's substance
 
 22
 
 use. We therefore conclude that the jury reasonably found
 B.C.B. to be dependent or neglected in this case.
 
 
          III.
 Conclusion
 
 
          ¶46
 For these reasons, we conclude that the Department
 sufficiently established, by a preponderance of the evidence,
 that (1) B.C.B. was born affected by substance exposure due
 to his positive test for methamphetamine at birth and (2)
 B.C.B.'s health or welfare is threatened by substance use
 due to mother's ongoing need for treatment to address her
 substance abuse issues.
 
 
          ¶47
 Accordingly, we reverse the judgment of the division below
 and remand this case for further proceedings consistent with
 this opinion.
 
 23
 
           CHIEF
 JUSTICE MÁRQUEZ, joined by JUSTICE SAMOUR, dissenting.
 
 
          ¶48
 Five years ago, the legislature amended section
 19-3-102(1)(g), enacting a significant change to the bases
 upon which a child may be found "neglected or
 dependent." Ch. 186, sec. 5, § 19-3-102(1)(g), 2020
 Colo. Sess. Laws 852, 854. Before this change, a child could
 be deemed dependent or neglected if the child "test[ed]
 positive at birth" for certain substances, unless the
 mother took such substances as prescribed. §
 19-3-102(1)(g), C.R.S. (2005). Senate Bill 20-028 ("An
 Act Concerning Measures to Assist an Individual's
 Recovery from a Substance Use Disorder") struck this
 language and replaced it with a different test, defining a
 child as dependent or neglected under this provision only if
 (1) the child is "born affected by alcohol or substance
 exposure" (the "affected-by-exposure"
 requirement), and (2) "the newborn child's health or
 welfare is threatened by substance use" (the
 "threatened-by-substance-use" requirement). 2020
 Colo. Sess. Laws at 852, 854; see also §
 19-3-102(1)(g), C.R.S. (2024) ("subsection
 (1)(g)").
 
 
          ¶49
 Today, the majority disregards this statutory change and
 effectively reinstates the policy previously reflected in the
 2005 statute-the very policy the General Assembly rejected
 when it enacted S.B. 20-028. Although the legislature struck
 the phrase "tests positive at birth" from
 subsection (1)(g), the majority nevertheless holds that an
 infant's positive drug test is sufficient to establish
 that the child was "born affected by alcohol or
 substance exposure" for purposes of
 
 24
 
 subsection (1)(g). Maj. op. ¶¶ 30, 32. The majority
 then broadly construes the threatened-by-substance-use
 requirement to include evidence that the substance to which a
 child was exposed poses a "particular risk" to a
 child's health or welfare. Id. at ¶ 35.
 Though it insists otherwise, id. at ¶ 39, the
 majority's interpretation of subsection (1)(g)
 effectively guarantees that a positive test for a substance
 that poses a risk of future health problems is sufficient to
 deem a child dependent or neglected, even absent a showing
 that the child was actually "affected by alcohol or
 substance exposure" and that the child's health or
 welfare is meaningfully "threatened by substance
 use."
 
 
          ¶50
 For a number of reasons, I cannot join the majority's
 decision.
 
 
          ¶51
 First, the majority's interpretation defies the plain
 language and statutory history of subsection (1)(g). The 2020
 amendments to subsection (1)(g) made clear that a child's
 mere "exposure" to alcohol or substances (as
 reflected by a drug test showing the presence of substances
 in the child's system) is insufficient, by itself, to
 deem a child dependent or neglected. Rather, subsection
 (1)(g) now requires that the child be "affected by"
 that exposure. The majority's reading erroneously
 conflates exposure and effect, and in so doing, fails to
 honor the legislative intent of the 2020 changes to the
 statute. See Farmers Ins. Exch. v. Bill Boom Inc.,
 961 P.2d 465, 469 (Colo. 1998).
 
 25
 
          ¶52
 Second, the majority fails to give deference to the State
 Board of Human services' ("Board") regulatory
 definition of the affected-by-exposure requirement-a
 definition promulgated under the legislature's express
 statutory directive to do so. § 19-3-216, C.R.S. (2024)
 ("The [Board] shall promulgate rules to determine . . .
 if a child is neglected or dependent as described in
 [subsection (1)(g)]."). Under the Board's
 regulation, a child is "born affected by alcohol or
 substance exposure" if the exposure "impacts the
 child's physical, developmental, and/or behavioral
 response." Dep't of Hum. Servs., 12 Colo. Code Regs.
 2509-1:7.000.2 (2025). The Board's regulation is a
 patently reasonable interpretation of the phrase "born
 affected by alcohol or substance exposure" in subsection
 (1)(g). See Larimer Cnty. Bd. of Equalization v. 1303
 Frontage Holdings LLC, 2023 CO 28, ¶ 30, 531 P.3d
 1012, 1020 ("[W]e may . . . defer to an administrative
 agency's reasonable interpretation of the statute
 it's charged with administering."). And its
 interpretation is grounded in the Board's special
 expertise in the area of child welfare services. See El
 Paso Cnty. Bd. of Equalization v. Craddock, 850 P.2d
 702, 704-05 (Colo. 1993) (explaining the circumstances under
 which deference to an agency's interpretation of a
 statute is appropriate). Accordingly, I would adopt the
 Board's definition of the affected-by-exposure
 requirement.
 
 26
 
          ¶53
 Finally, I disagree with the majority that the evidence here
 was sufficient for a reasonable jury to conclude that B.C.B.
 was "born affected by" exposure to methamphetamine.
 See Maj. op. ¶ 37. I therefore do not reach the
 question of whether the evidence established that the
 child's health or welfare was "threatened by
 substance use."
 
 
          ¶54
 Accordingly, I respectfully dissent.
 
 
          I.
 Subsection (1)(g) Does Not Permit a Finding of Dependency or
 Neglect Based Solely on an Infant's Positive Test for
 Substances
 
 
          ¶55
 The majority holds that an infant's positive test for
 substances satisfies the affected-by-exposure requirement of
 subsection (1)(g) because "the presence of illicit
 substances in a newborn child's body due to a
 mother's use of such substances is plainly an effect of
 mother's use." Maj. op. ¶ 32. In my view, this
 reading contradicts the text of subsection (1)(g) and
 contravenes the legislature's clear intent in amending
 this provision.
 
 
          A. The
 Text of Subsection (1)(g) Does Not Support the Majority's
 Reading
 
 
          ¶56
 When interpreting statutes, this court's objective is
 "to ascertain and give effect to the General
 Assembly's intent." People in Int. of J.G.,
 2016 CO 39, ¶ 13, 370 P.3d 1151, 1157. We look first to
 the "plain and ordinary meaning of the General
 Assembly's words." Id. And we may consider
 "a provision's statutory history-the 'evolution
 of a statute as it is amended over time by the
 
 27
 
 legislature'" -to "'inform[] our
 understanding of legislative intent.'" Plemmons
 v. People, 2022 CO 45, ¶ 33, 517 P.3d 1210, 1218
 (quoting Colo. Oil & Gas Conservation Comm'n v.
 Martinez, 2019 CO 3, ¶ 30 n.2, ¶ 31, 433 P.3d
 22, 29 n.2, 30).
 
 
          ¶57
 The majority's interpretation of subsection (1)(g)
 erroneously conflates an infant's "exposure" to
 substances with the statutory requirement that the infant be
 "affected by" that exposure. As the majority
 acknowledges, the word "affect" means "'to
 produce an effect (as of disease) upon . . .' and 'to
 have a detrimental influence on.'" Maj. op. ¶
 32 (quoting Affect, Webster's Third New
 International Dictionary (2002)). The majority correctly
 concludes that the phrase "affected by alcohol or
 substance exposure" requires a "showing that [the]
 alcohol or substance exposure has had an effect on a newborn
 child." Id. But this means that mere exposure
 (as reflected by the presence of a substance in a child's
 system) does not, by itself, establish that such exposure has
 "produced] an effect" or caused some
 "detrimental influence" on the child. In short, a
 positive test does not, standing alone, prove that a child
 was "affected by alcohol or substance exposure."
 § 19-3-102(1)(g).
 
 
          ¶58
 The majority attempts to avoid this result by reasoning that
 "the presence of illicit substances in a newborn
 child's body . . . is plainly an effect of mother's
 use." Maj. op. ¶ 32. But this reasoning disregards
 the language of the statute. At most, "the presence of
 illicit substances" reflects the child's in utero
 exposure to
 
 28
 
 such substances (via the mother's ingestion of them). But
 subsection (1)(g) requires more; namely, evidence of some
 (presumably adverse) effect from that exposure. Under the
 majority's logic, however, no such effect is required
 because exposure alone (as reflected by a positive test) is
 sufficient.
 
 
          ¶59
 By deeming exposure alone sufficient to satisfy the
 affected-by-exposure requirement of subsection (1)(g), the
 majority invites the state to intervene in the parent-child
 relationship-even absent evidence that such exposure has
 adversely affected the child. See C.W.B., Jr. v.
 A.S., 2018 CO 8, ¶ 22, 410 P.3d 438, 443
 (explaining that article 3 of the Children's Code is
 designed to permit state intervention only "where
 necessary to protect the welfare of children"). This
 reading runs contrary to the plain language and legislative
 intent of the statute.
 
 
          B. The
 Statutory History of Subsection (1)(g) Reflects a Legislative
 Intent to Require More Than a Positive Drug Test to Satisfy
 the Statute's Requirements
 
 
          ¶60
 The 2020 amendments to subsection (1)(g) confirm the
 legislature's intent to require more than a positive drug
 test to satisfy the statute's requirements.
 
 
          ¶61
 As originally enacted, subsection (1)(g) designated a child
 dependent or neglected if the child "test[ed] positive
 at birth for either a schedule-I controlled substance . . .
 or a schedule-II controlled substance . . . unless the child
 test[ed] positive for a schedule-II controlled substance as a
 result of the mother's lawful intake of such substance as
 prescribed." § 19-3-102(1)(g), C.R.S. (2005). With
 
 29
 
 S.B. 20-028, the legislature struck this language entirely
 and replaced the simple positive-test requirement with two
 distinct requirements: the affected-by-exposure requirement
 and the threatened-by-substance-use requirement. 2020 Colo.
 Sess. Laws at 854.
 
 
          ¶62
 The wholesale replacement of language in a statute reflects
 the General Assembly's intent to change the law. City
 of Colo. Springs v. Powell, 156 P.3d 461, 465 (Colo.
 2007) ("[B]y amending the law, the legislature has
 intended to change it."). By striking the language
 referring to a positive drug test, the General Assembly made
 clear that a child's mere exposure to alcohol or
 substances is no longer sufficient to find a child dependent
 or neglected under subsection (1)(g).
 
 
          ¶63
 The majority acknowledges this change in the law. Maj. op.
 ¶¶ 28-30. But in its view, the legislature intended
 the new language to broaden the circumstances that can
 establish that a child is affected by exposure. Id.
 at ¶ 38. The majority further posits that although a
 positive drug test satisfies the affected-by-exposure
 requirement, the newly added threatened-by-substance-use
 requirement forecloses the possibility that a positive test
 alone will result in a finding of dependency or neglect.
 Id. at ¶ 39.
 
 
          ¶64
 To the extent the majority's reading permits
 circumstances other than a positive drug test to satisfy the
 affected-by-exposure requirement, I agree. For example,
 withdrawal symptoms, when sufficiently linked to an
 infant's substance
 
 30
 
 exposure, necessarily demonstrate that the infant was
 "born affected by alcohol or substance exposure."
 § 19-3-102(1)(g). But for the reasons explained above, a
 positive drug test indicates only exposure, not the
 effects of that exposure. Thus, even assuming
 subsection (1)(g) now permits a variety of circumstances to
 satisfy the affected-by-exposure requirement, see
 Maj. op. ¶ 38, it forecloses the possibility that a
 positive test alone could meet that requirement.
 
 
          ¶65
 I agree with the majority's observation that the
 threatened-by-substance-use requirement is a new addition to
 subsection (1)(g) that did not previously exist. Id.
 at ¶ 39. But if the legislature intended to preserve a
 positive drug test as sufficient to support a dependency or
 neglect determination, it could have retained the "tests
 positive" language and simply added the
 threatened-by-substance-use requirement. The legislature
 instead made a very different choice: it struck the
 "tests positive" language and rewrote subsection
 (1)(g) in a manner that requires not just a child's
 exposure to alcohol or substances, but also that such
 exposure actually "affect" the child. §
 19-3-102(1)(g).
 
 
          ¶66
 Notably, the majority's opinion allows for some
 circumstances in which an infant's positive test for
 substances could alone be sufficient to support a finding of
 dependency or neglect under subsection (1)(g). In the
 majority's view, evidence "establish[ing] that
 exposure to a given substance is known to create a particular
 risk to a child's health or welfare" satisfies the
 threatened-by-substance-use
 
 31
 
 requirement. Maj. op. ¶ 35. This means that under the
 majority's approach, a court may find an infant dependent
 or neglected based solely on the infant's positive test
 at birth for a substance that experts "know" is
 likely to cause physical, cognitive, or behavioral conditions
 in some children. See id. at ¶¶ 10, 35,
 42.
 
 
          ¶67
 My concern is that the majority's reading of subsection
 (1)(g) invites courts to find children dependent or neglected
 based solely on the child's positive test for alcohol or
 substances. But the legislature's 2020 amendments reflect
 that this is precisely the result it sought to change. By
 construing subsection (1)(g) to still permit a finding of
 dependency or neglect (at least in some circumstances) based
 solely on a positive drug test, the majority disregards the
 legislature's intent.[1] See Farmers Ins. Exch., 961
 P.2d at 469 ("In construing statutory provisions, our
 
 32
 
 obligation is not to make policy decisions but rather to give
 full effect to the legislative intent.").
 
 
          ¶68
 For these reasons, I conclude that an infant's positive
 drug test-standing alone-no longer satisfies any requirement
 of subsection (1)(g). Rather, a finding of dependency or
 neglect under subsection (1)(g) requires evidence showing
 that the child was actually "affected by" their
 exposure to alcohol or drugs and that the child's health
 or welfare is meaningfully threatened by substance use.
 
 
          II.
 The Board's Regulatory Definitions of the Requirements of
 Subsection (1)(g) Merit This Court's Deference
 
 
          ¶69
 The Board's regulations lend further support to this
 conclusion and merit this court's deference.
 
 
          ¶70
 As part of S.B. 20-028, the legislature expressly delegated
 to the Board the authority to promulgate regulatory guidance
 for implementing subsection (1)(g). 2020 Colo. Sess. Laws at
 854; § 19-3-216 (stating that the Board "shall
 promulgate rules to determine . . . if a child is neglected
 or dependent as described in section 19-3-102(1)(g)").
 Section 19-3-216 unambiguously "imbues the [Board] with
 broad authority to determine" when a child's
 circumstances warrant a finding of dependency or neglect
 under subsection (1)(g). Kaiser v. Aurora Urb. Renewal
 Auth., 2024 CO 4, ¶ 34, 541 P.3d 1180, 1188;
 see also id. at ¶ 38, 541 P.3d at 1188-89
 (deferring to the Property Tax Administrator's
 regulations where a statute "unambiguously entrust[ed]
 the Administrator with the responsibility to develop
 
 33
 
 '[t]he manner and methods by which'" another
 statute would be implemented (alteration in original)
 (quoting § 31-25-107(9)(h), C.R.S. (2024))).
 
 
          ¶71
 The majority downplays this express delegation of authority
 to the Board and declines to follow the Board's
 definition of the affected-by-exposure requirement because,
 in its view, the Board's definition is inconsistent with
 the text of subsection (1)(g). Maj. op. ¶ 33. I
 respectfully disagree.
 
 
          ¶72
 The Board defines a child as "born affected by alcohol
 or substance exposure" when that exposure "impacts
 the child's physical, developmental, and/or behavioral
 response." 12 Colo. Code Regs. 2509-1:7.000.2. This
 definition identifies the types of effects that render a
 child "born affected by alcohol or substance
 exposure" in a manner that properly distinguishes
 between exposure (as reflected by a positive drug
 test) and the effects of such exposure (as measured
 by an infant's actual responses to that exposure). It
 also comports with the legislature's intent, as expressed
 in the statutory history, to require more than a positive
 drug test to trigger the application of subsection (1)(g).
 Thus, the Board's definition of the affected-by-exposure
 requirement is consistent with the statutory text.
 
 
          ¶73
 The Board's regulation also draws a clear distinction
 between subsection (1)(g)'s two requirements. Under the
 Board's regulation, the affected-by-exposure requirement
 captures a child's physical, developmental, and
 
 34
 
 behavioral responses to substance exposure. 12 Colo. Code
 Regs. 2509-1:7.000.2. In contrast, the
 threatened-by-substance-use requirement refers to the risk
 that substance use will prevent the child's caregivers
 from meeting the child's medical, physical, or
 developmental needs. Id. In this way, the
 Board's regulation comports with the text and purpose of
 subsection (1)(g): to deem a child dependent or neglected
 only when alcohol or substance exposure actually affects the
 child and substance use risks rendering the
 child's caregivers incapable of providing the care the
 child needs.
 
 
          ¶74
 Finally, the Board's interpretation of subsection (1)(g)
 warrants special consideration because it involves a subject
 that "calls for the exercise of technical expertise
 which the agency possesses." Craddock, 850 P.2d
 at 705. As part of the Department of Health and Human
 Services ("DHS"), the Board contributes to the
 administration of "[c]hild welfare services," which
 include, among other things, child protection, risk
 assessment, and out-of-home placement for dependent or
 neglected children. § 26-5-101(3), C.R.S. (2024)
 (defining "[c]hild welfare services"); §
 26-1-201(1)(f), C.R.S. (2024) (creating DHS in part to
 administer "[c]hild welfare services"). As the
 entities responsible for providing and managing child
 protective services, DHS and the Board possess the
 subject-matter expertise necessary to implement the
 legislature's directive to define what
 
 35
 
 constitutes dependency or neglect for purposes of subsection
 (1)(g). See § 19-3-216. That expertise merits
 this court's deference.
 
 
          ¶75
 In sum, the Board's regulatory interpretation of the
 statute has a reasonable basis in law that deserves this
 court's deference. See Stell v. Boulder Cnty.
 Dep't of Soc. Servs., 92 P.3d 910, 916 (Colo. 2004)
 (observing that a court will generally accept an
 interpretation of a statute by the agency charged with its
 administration where that interpretation has a
 "reasonable basis in law"). For these reasons, I
 would respect the legislature's express delegation of
 authority to the Board to promulgate regulations defining the
 circumstances that satisfy subsection (1)(g)'s
 requirements. Affording "appropriate deference" to
 the Board's regulations, Craddock, 850 P.2d at
 705, I would hold that an infant is "affected by alcohol
 or substance exposure" when that exposure impacts the
 infant's physical, developmental, or behavioral
 response.[2]
 
 36
 
          III.
 The Evidence Here Is Insufficient to Support a Reasonable
 Jury's Conclusion that B.C.B. Is Affected by Substance
 Exposure
 
 
          ¶76
 The majority holds that B.C.B.'s positive test for
 methamphetamine at birth is sufficient evidence to conclude
 that B.C.B. was "affected by" substance exposure
 within the meaning of subsection (1)(g). Maj. op. ¶ 37.
 For the reasons discussed above, I cannot read subsection
 (1)(g) as allowing a mere positive test to meet this
 requirement. Instead, applying the Board's regulatory
 definition of the affected-by-exposure requirement, I would
 hold that the evidence in the record is insufficient to
 support a reasonable jury's conclusion that B.C.B. was
 born affected by exposure to methamphetamine.[3]
 
 
          ¶77
 Admittedly, certain evidence in the record arguably
 could support the conclusion that prenatal exposure
 to methamphetamine impacted B.C.B.'s physical,
 behavioral, or developmental response. However, this evidence
 falls short.[4]
 
 37
 
          ¶78
 First, Dr. Anna Lawrence observed that B.C.B. had "some
 problems with latching" and noted that such problems
 "could be potentially drug related." Such problems
 would constitute a physical, behavioral, or developmental
 response to methamphetamine exposure. However, Dr. Lawrence
 then explained that B.C.B.'s trouble feeding could have
 been "just a newborn baby struggling to learn how to
 eat." As a result, she was unable to state "with
 any degree of medical certainty that [B.C.B.'s] latching
 problem was the result of substance withdrawal." Dr.
 Lawrence's inability to link B.C.B.'s trouble
 latching to his methamphetamine exposure with any degree of
 medical certainty precludes this court from fairly inferring
 such a link on its own. People in Int. of D.L.R.,
 638 P.2d 39, 41 (Colo. 1981) (requiring that a court draw
 only those inferences that are "fairly deducible from
 the evidence").
 
 
          ¶79
 Second, Dr. Stephanie Lombardi recalled reports from
 B.C.B.'s caregiver that he had experienced tremors, was
 easily startled, and exhibited "a little bit of sweating
 throughout the day." She testified that such symptoms
 could "potentially" indicate methamphetamine
 withdrawal (that is, a physical response
 
 38
 
 to methamphetamine exposure). But like Dr. Lawrence, Dr.
 Lombardi could not "opine with medical certainty"
 that the symptoms reported to her represented symptoms of
 withdrawal; instead, she testified that it was merely
 "possible" that the tremors B.C.B.'s caregiver
 reported were related to substance exposure. This mere
 possibility is insufficient to conclude that B.C.B. was
 actually affected by prenatal exposure to methamphetamine.
 See Daugaard v. People in Int. of Daugaard, 488 P.2d
 1101, 1103-04 (Colo. 1971) (explaining that opinions
 "essentially based upon possibilities" regarding
 the cause of a child's symptoms "amount[] to no more
 than conjecture and speculation"), overruled on
 other grounds by People v. Ramirez, 155 P.3d 371, 376-77
 (Colo. 2007).
 
 
          ¶80
 Third, all three experts who testified pointed to some
 medical evidence that prenatal methamphetamine exposure may
 have some effect on a child's physical, behavioral, or
 cognitive development in the future. But none of the three
 experts could describe the risk that B.C.B.'s exposure
 would affect his development as probable with any
 degree of medical certainty; again, they described the risk
 as merely possible.[5] See id. at 1103
 (requiring for sufficiency purposes that evidence be
 presented with "reasonable medical certainty or
 probability"). At most,
 
 39
 
 evidence of such possible risks would suffice to conclude
 that if B.C.B. experiences developmental or
 behavioral deficiencies in the future, those deficiencies
 may be linked to his prenatal methamphetamine
 exposure. The mere possibility that such a link may exist
 does not, however, constitute sufficient evidence that B.C.B.
 was actually "affected by" prenatal methamphetamine
 exposure as required by subsection (1)(g). See id.
 at 1103-04.
 
 
          ¶81
 To the contrary, ample evidence showed that B.C.B. was
 healthy from the time he was born until at least several
 months later. Dr. Lawrence testified that, shortly after his
 birth, B.C.B. "wasn't behaving differently from most
 babies" and performed well on post-natal screenings,
 including neurological tests. Dr. Lombardi agreed that B.C.B.
 was "a healthy child," noting that the results of
 his physical exam and of tests for his "neurological and
 infantile reflexes" did not raise any concerns. And Dr.
 Welfare testified that B.C.B. was "doing very well"
 in general and "was on track developmentally." This
 testimony suggests that the only inference "fairly
 deducible from the evidence" is that B.C.B. was a
 healthy baby, not that he was born affected by exposure to
 any substance. See D.L.R., 638 P.2d at 41.
 
 
          ¶82
 Accordingly, I would affirm the court of appeals division
 majority and hold that the evidence is insufficient to
 support a reasonable jury's conclusion that
 
 40
 
 B.C.B. was "affected by alcohol or substance
 exposure" as required by subsection (1)(g).
 
 
          IV.
 Conclusion
 
 
          ¶83
 The majority's interpretation of section 19-3-102(1)(g)
 effectively negates the legislature's policy shift
 expressed by the amendments in S.B. 20-028. The
 majority's reading conflates the fact of substance
 exposure with the showing of adverse effects from such
 exposure. As a result, it allows an infant's positive
 test to always satisfy the affected-by-exposure requirement
 and, at least in some circumstances, to constitute the sole
 basis for a finding of dependency or neglect- despite the
 legislature's decision to remove the statutory language
 that previously permitted such a result.
 
 
          ¶84
 In reaching this outcome, the majority disregards the plain
 language and statutory history of subsection (1)(g)'s
 affected-by-exposure requirement. The majority further
 rejects the Board's reasonable regulatory definition of
 the affected-by-exposure requirement, eschewing the
 legislature's clear delegation of authority to the Board
 to interpret subsection (1)(g)'s nuances in light of the
 Board's special expertise in child welfare services. I
 cannot support this result.
 
 
          ¶85
 Reading the plain language of subsection (1)(g), I would hold
 that an infant's positive drug test does not, standing
 alone, satisfy the affected-by-exposure requirement. Rather,
 I would turn to the Board's definition of this
 requirement for
 
 41
 
 guidance and conclude that a child is "affected by
 alcohol or substance exposure" under subsection (1)(g)
 if the exposure impacts the child's physical, behavioral,
 or developmental response. 12 Colo. Code Regs.
 2509-1:7.000.2. And in this case, I would hold that the
 evidence is insufficient to show that B.C.B. was so impacted.
 
 
          ¶86
 To the extent the legislature's changes to subsection
 (1)(g) might be perceived as endangering infants whose
 parents are ill-equipped to care for them, numerous grounds
 for a dependency-or-neglect finding under section 19-3-102(1)
 guard against such an outcome. See §
 19-3-102(1) (defining a child as "neglected or
 dependent" if (a) a parent has abandoned, mistreated, or
 allowed others to mistreat the child, (b) "[t]he child
 lacks proper parental care through the actions or omissions
 of the parent," and (c) "[t]he child's
 environment is injurious to his or her welfare").
 Indeed, evidence of a parent's prenatal substance abuse-
 including an infant's positive test for substances like
 methamphetamine-may support a finding of dependency or
 neglect under some of these provisions. See People in
 Int. of T.T., 128 P.3d 328, 329-30 (Colo.App. 2005)
 (holding that evidence of a parent's prenatal substance
 abuse, including an infant's positive test for, among
 other substances, methamphetamines, "may . . . support
 the filing of a petition in dependency or neglect under
 § 19-3-102(1)(a)-(c)"). But nothing in subsection
 (1)(g) allows a mere positive test to support such a finding.
 
 
          ¶87
 I respectfully dissent.
 
 
 ---------
 
 
 Notes:
 
 
 [1] Specifically, we granted certiorari to
 review the following issues:
 
 
 1. Did the court of appeals correctly interpret the
 amended language of Colorado Revised Statute section
 19-3-102(1)(g)?
 
 
 2. Did the court of appeals err in finding that there
 was insufficient evidence to support the jury's verdict,
 by a preponderance of the evidence, that BCB [sic] was
 dependent and neglected?
 
 
 3. Whether a divided division of the court of appeals
 erred in its interpretation of recently amended section
 19-3-102(1)(g), C.R.S., and in relying on agency regulations
 to define this statutory provision.
 
 
 [1] The majority suggests that that the
 legislative history of S.B. 20-028 supports its
 interpretation because one of the bill's supporters
 testified that the bill "deemphasize[s] the focus on a
 child's positive test at birth and . . . shift[s] the
 focus to a holistic assessment of the family's needs and
 strengths." Maj. op. ¶ 29. But to the extent the
 majority leans on legislative history, that history shows
 that by amending subsection (1)(g), the bill's sponsors
 sought to eliminate the threat of a finding of dependency or
 neglect based solely on an infant's positive drug test,
 specifically to (1) encourage pregnant mothers to "get
 help" with substance-use disorders, (2) "keep
 [babies] with their moms" once they are born to
 "get them to bond together," and (3) take advantage
 of new mothers' "heightened motivation" to seek
 treatment for their disorders. Hearings on S.B. 028 before
 the H. Comm. on Health & Ins., 72d Gen. Assemb., 2d.
 Sess. (June 10, 2020) (statements of Rep. Buentello). By
 perpetuating the threat that a positive drug test may result
 in a dependency or neglect determination, the majority
 undermines these goals.
 
 
 [2] I note that the majority's
 rejection of the Board's regulation as "inconsistent
 with the plain meaning" of the statute, Maj. op. ¶
 33, simply highlights the majority's conflation of
 exposure with the effects of such exposure.
 The majority rejects the Board's regulation because it
 concludes that the statute does not require the child to be
 "impacted" (physically, developmentally, or
 behaviorally) by the exposure. Id. But
 "impact" is merely a synonym for
 "affect." See Impact, Merriam-Webster
 Dictionary,
 https://www.merriam-webster.com/dictionary/impact
 [https:// perma.cc/H6CA-WSRT] (defining
 "impact" as "to have a direct effect
 or impact on" (emphasis added)). And a showing that the
 child is "affected" by substance exposure is
 precisely what the 2020 amendments to subsection (1)(g) now
 require.
 
 
 [3] Because this holding alone negates a
 finding of dependency or neglect, I, like the division
 majority below, would not reach the
 threatened-by-substance-use requirement of subsection (1)(g).
 See People in Int. of B.C.B., 2024 COA 88,
 ¶¶ 25, 34, 558 P.3d 980, 986, 988.
 
 
 [4] The majority analyzes this same
 evidence. Maj. op. ¶ 42. Notably, the majority concludes
 that it would "arguably" be speculative to draw any
 inference from this evidence regarding the health effects
 B.C.B. experienced as a result of his prenatal
 methamphetamine exposure. Id. at ¶ 43. The
 majority avoids actually deeming this evidence speculative,
 however, because it mistakenly considers this evidence only
 as it relates to the threatened-by-substance-use requirement.
 Id. at ¶¶ 41-42, 44. This error allows the
 majority to rely on other evidence-namely, of mother's
 ability to care for B.C.B.-in evaluating whether the
 threatened-by-substance-use requirement is satisfied.
 Id. at ¶¶ 44-45. Because I consider this
 evidence only for purposes of applying the
 affected-by-exposure requirement, I evaluate whether it is
 too speculative to satisfy that requirement here. I conclude
 that it is.
 
 
 [5] Dr. Heather Welfare, B.C.B.'s
 primary-care physician, even noted that she did not recommend
 seeing B.C.B. more frequently for "developmental
 surveillance" or "growth concerns" than she
 would see other children.
 
 
 ---------