934 F.2d 474
 60 USLW 2015
 David F. McCOMB, as guardian ad litem for Khemsu Walton, a
Minor Child, Appellant,
v.
Rosita WAMBAUGH, Supervisor, Philadelphia Department of
Public Welfare; Jean Summons, Social Worker, Philadelphia
Department of Public Welfare, Children and Youth Agency;
Murray Sklar, Social Worker, Philadelphia Department of
Public Welfare, Children and Youth Agency; City of
Philadelphia; Irene Pernsley, Commissioner of Philadelphia
Department of Public Welfare; Peter Digre, Deputy
Commissioner of Philadelphia County Children and Youth
Agency; Gordon West, Deputy Commissioner of Philadelphia
County Children and Youth Agency; Wilbur Hobbs, Deputy
Commissioner of Philadelphia County Children and Youth
Agency, Appellees.
 No. 90-1831.
 United States Court of Appeals,
Third Circuit.
 Argued March 11, 1991.
Decided May 30, 1991.
 
 Mary B. Stein (argued), Silverman & Coopersmith, Philadelphia, Pa., for appellant.
 Charisse R. Lillie, City Sol., Doris M. Leisch, Chief Deputy City Sol., Philadelphia, Pa.
 Guy Vilim (argued), Richard J. Gold, Padova & Hinman, Philadelphia, Pa., for appellees.
 Before MANSMANN, HUTCHINSON, and WEIS, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 As a result of parental abuse, the minor plaintiff suffered severe injuries for which he seeks damages against a municipality and its employees because of their failure to protect him. We conclude that a protective order issued by a Virginia court purportedly in accordance with the Interstate Compact for Placement of Children did not establish a special relationship between the plaintiff and the Pennsylvania defendants. Because a private individual caused the harm and no special relationship existed, the district court granted summary judgment for the defendants. We will affirm.
 
 
 2
 Khemsu Walton was born in Philadelphia in 1980. Two weeks later he, his siblings, and mother, Marie Walton, were all injured in an automobile accident in Virginia. When taken to the hospital, the children were found to be suffering from malnutrition. After an investigation by Virginia social welfare agencies, the Domestic Relations Court of Halifax County, Virginia removed the children from their mother's custody and placed them in the temporary custody of the Halifax County Department of Social Services. Following partial recovery from her injuries, Marie Walton, but not the children, returned to her Philadelphia home. The Halifax Court later placed Khemsu in foster care with his aunt and uncle in Virginia.
 
 
 3
 Ms. Walton maintained contact with the Halifax court and petitioned for the return of her children or, in the alternative, maintenance of the children's previous diet. One year after the automobile accident, Halifax County sought information for a forthcoming hearing on Ms. Walton's petitions. Pursuant to the Interstate Compact on the Placement of Children, to which Pennsylvania and Virginia are parties, the County social workers submitted a request for information through the Commonwealth of Virginia's Interstate Placement Specialist. In turn, that official requested that her counterpart in the Pennsylvania Department of Welfare contact the appropriate Philadelphia agency for an evaluation of the Walton home after an unannounced visit.
 
 
 4
 The Philadelphia Department of Public Welfare was given the responsibility for providing the necessary information. Defendant Jean Summons, a social worker employed by the Department, interviewed Marie Walton and according to Department procedure, but contrary to Virginia's wishes, made an announced visit to the Walton home. After that investigation, Summons and her supervisor, defendant Rosita Wambaugh, reported to Pennsylvania's Compact Administrator that they "would approve of the children being returned to their mother."
 
 
 5
 On October 20, 1981 the Halifax Court directed that "custody" of Khemsu's three oldest siblings be "returned" to Marie Walton "but under supervision of the Department of Social Services for the City of Philadelphia, which department shall make at least bi-monthly unannounced visitations of the home." The order also asked Philadelphia to file a progress report within six months so that the court could determine whether to return custody of the two youngest children to their mother.
 
 
 6
 Although the Virginia authorities had requested unannounced visits to the Walton home, the Philadelphia Department's policy called for prearranged home visitation. Over the next eight months, Summons made two announced visits and found the home in satisfactory condition, the children healthy and attending school. In April 1982, Summons wrote to the Virginia Court stating that she had spoken with Marie Walton and that because she had demonstrated the capability to care for her children, Philadelphia would support the mother in her desire to reunite her family.
 
 
 7
 On April 27, 1982 the Halifax Court ordered that custody of Khemsu and his brother "is hereby returned to their mother, Maria[sic] Walton, but under continuing supervision of the appropriate Department of Social Services in Philadelphia, Pa." On the same day, the judge signed an Interstate Compact Application Child Placement Request for each of the five children. The documents purported to "place" the children with their mother and requested quarterly reports from the receiving agency. A social worker from Virginia then accompanied Khemsu and his brother on the trip to Philadelphia and left them with Ms. Walton at her home.
 
 
 8
 On May 27, 1982, the Pennsylvania Compact Administrator advised her Virginia counterpart that Pennsylvania had approved the placement requests. She noted, however, that Pennsylvania would provide a six-month report on the Walton children instead of the quarterly reports Virginia had requested.
 
 
 9
 On October 22, 1982 and February 24, 1983 the Halifax County social worker asked for the Compact Administrator's progress reports. In response to these requests, defendant Summons notified Pennsylvania's Compact Administrator that Ms. Walton refused to cooperate and would not permit a home visit. In her letter, Ms. Summons concluded "if Virginia wants us to make another attempt to investigate Ms. Walton, please have them notify us in writing."
 
 
 10
 A copy of the letter was also sent to the social worker in Halifax County. Apparently nothing further was done by either the Philadelphia or Virginia authorities.
 
 
 11
 On August 17, 1984 Ms. Walton brought four-year old Khemsu to a hospital in Philadelphia. He weighed 13 pounds and was in a comatose condition. As a result of malnutrition, he has suffered irreversible brain damage.
 
 
 12
 Ms. Walton plead guilty to criminal charges arising out of her failure to provide properly for Khemsu. The child now lives in foster care.
 
 
 13
 Khemsu's hospitalization occurred more than two years after he was returned to his mother, and more than fifteen months after Philadelphia's last correspondence with Virginia.
 
 
 14
 Khemsu's guardian ad litem filed suit in the district court seeking damages under 42 U.S.C. Sec. 1983. The complaint names the City of Philadelphia and various employees of the Department of Public Welfare as defendants, charging that they failed to evaluate properly Marie Walton's capacity to care adequately for her children, failed to perform visits as required by the Compact and the Virginia court order, and displayed deliberate indifference to Khemsu's constitutional rights.
 
 
 15
 The district court concluded that any custodial relationship between the Halifax Department of Social Services and Khemsu was terminated on April 27, 1982 by the Virginia court order of that date. Thereafter, because Khemsu was in the care and custody of his mother, the Virginia order did not create a special or custodial relationship. In addition, the Interstate Compact created no entitlement to or liberty interest in being free from his mother's mistreatment. The court decided, therefore, that DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), required the entry of summary judgment for all defendants.
 
 
 16
 On appeal, plaintiff contends DeShaney is inapposite; that defendants adopted and implemented policies deliberately indifferent to the constitutional rights of children whom the agency was charged to protect; that the Interstate Compact and the Virginia court order imposed duties on the Philadelphia Department that established a special relationship with Khemsu; that the Philadelphia Department played an active role in the creation of the danger to Khemsu; and finally, that the Department's practices violated the Equal Protection Clause.
 
 
 17
 Defendants assert that DeShaney governs the case; that the plaintiff's injuries were caused by a private individual, not a state actor; that neither the Interstate Compact nor the Virginia court order imposed legal duties on the defendants; that defendants' actions or inactions in no way caused Khemsu's injuries; and that the state-created distinction between supervision of children returned to their parents and children placed in foster care is rational, and thus not violative of Equal Protection.
 
 I.
 
 18
 As the district court recognized, the pivotal issue is whether DeShaney controls this dispute. In that case, a father battered his four-year old son causing severe and permanent brain damage. For two years before the last beating, county social workers had been alerted to the likelihood of the father's abuse, and at one point the local court placed the child in the custody of a hospital to which he had been admitted. Caseworkers had made numerous visits to the child and had received a number of reports from hospital emergency rooms about suspicious injuries suffered by the child. Nevertheless, the County Department of Social Services took no action to terminate the father's custody.
 
 
 19
 The Supreme Court rejected the child's claim that he had been deprived of substantive due process, holding that "nothing in the language of the Due Process Clause itself requires the state to protect the life, liberty, and property of its citizens against invasion by private actors." Id. at 195, 109 S.Ct. at 1003. Because the Due Process Clause generally does not require the state to provide protection, it follows that the "state cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide [protective services]." Id. at 197, 109 S.Ct. at 1004.
 
 
 20
 The Court rejected the argument that having actively undertaken to protect the child, the state had an affirmative duty to do so in a reasonably competent fashion. Acknowledging that a state is responsible for the safety of individuals whom it incarcerates or commits involuntarily to institutions, the Supreme Court explained that no such special relationship existed between the state and a child in his father's custody.
 
 
 21
 Plaintiff recognizes that DeShaney presents a major obstacle to his claim, but contends this Court distinguished that case in Stoneking v. Bradford Area School Dist., 882 F.2d 720 (3d Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990), holding that a school district could be liable for its policies of deliberate indifference toward alleged abuse by one of its teachers. We, however, emphasized that "[t]he principal distinction between DeShaney's situation and that of Stoneking is that DeShaney's injuries resulted at the hands of a private actor, whereas Stoneking's resulted from the actions of a state employee." Id. at 724.
 
 
 22
 The distinction between harm inflicted by a state agent and injury caused by a private individual is critical. See Philadelphia Police & Fire Ass'n for Handicapped Children, Inc. v. Philadelphia, 874 F.2d 156, 167 (3d Cir.1989) ("Just as in DeShaney, the retraction of state intervention permits the harm, but the harm in each case actively is caused by a source other than the state."); Doe v. Milwaukee County, 903 F.2d 499, 502 (7th Cir.1990) (children's civil rights action for abuse by mother "squarely barred by DeShaney" because mother was private, not state, actor).
 
 
 23
 In the case at hand, Khemsu's mother, a private individual and not a state actor, inflicted the injury. The circumstances here mirror those in DeShaney and differ dispositively from those in Stoneking. Accordingly, Stoneking does not allow recovery here.
 
 II.
 
 24
 Plaintiff next asserts that the Virginia court order, together with the Interstate Compact on the Placement of Children, created a special relationship between Philadelphia and Khemsu within the exception outlined in DeShaney. In the plaintiff's view, the court order, in conjunction with the Compact, extended the jurisdiction of the Virginia court into Philadelphia so as to impose legal obligations on the City's social workers. Defendants contend that the Compact did not apply to Khemsu's situation. We must, therefore, analyze the scope of the Compact.
 
 
 25
 Interstate compacts predate the drafting of the Constitution. See generally, Frankfurter & Landis, The Compact Clause of the Constitution-A Study in Interstate Adjustments, 34 Yale L.J. 685 (1925). They provided a means through which the sovereign states could resolve conflicts, such as boundary disputes, among themselves. Id.
 
 
 26
 The Constitution recognizes compacts in Article I, section 10, clause 3, which reads, "No state shall, without the Consent of the Congress ... enter into any Agreement or Compact with another State." Despite the broad wording of the clause Congressional approval is necessary only when a Compact is "directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States." United States Steel Corp. v. Multistate Tax Comm'n, 434 U.S. 452, 468, 98 S.Ct. 799, 810, 54 L.Ed.2d 682 (1978) (quoting Virginia v. Tennessee, 148 U.S. 503, 519, 13 S.Ct. 728, 734, 37 L.Ed. 537 (1893)).
 
 
 27
 The Interstate Compact on Placement of Children has not received Congressional consent. Rather than altering the balance of power between the states and the federal government, this Compact focuses wholly on adoption and foster care of children--areas of jurisdiction historically retained by the states. In re Burrus, 136 U.S. 586, 593-94, 10 S.Ct. 850, 852-53, 34 L.Ed. 500 (1890); Lehman v. Lycoming County Children's Services Agency, 648 F.2d 135, 143 (3d Cir.1981) (en banc), aff'd, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982). Congressional consent, therefore, was not necessary for the Compact's legitimacy.
 
 
 28
 Because Congressional consent was neither given nor required, the Compact does not express federal law. Cf. Cuyler v. Adams, 449 U.S. 433, 440, 101 S.Ct. 703, 707, 66 L.Ed.2d 641 (1981). Consequently, this Compact must be construed as state law. See Engdahl, Construction of Interstate Compacts: A Questionable Federal Question, 51 Va.L.Rev. 987, 1017 (1965) ("[T]he construction of a compact not requiring consent ... will not present a federal question....").
 
 
 29
 Nevertheless, uniformity of interpretation is important in the construction of a Compact because in some contexts it is a contract between the participating states. See West Virginia ex rel. Dyer v. Sims, 341 U.S. 22, 27-28, 71 S.Ct. 557, 560, 95 L.Ed. 713 (1951). Having entered into a contract, a participant state may not unilaterally change its terms. A Compact also takes precedence over statutory law in member states.
 
 
 30
 The crucial question here is whether the Interstate Compact on the Placement of Children applies when a court in one state directs that a child be taken from foster care and sent to a natural parent in another participating state. Mindful of the need for uniform interpretation, we have not only searched for Pennsylvania cases discussing the Compact, but for those of other states as well. The results, however, have not been helpful. No state Supreme Court has analyzed the question in a reasoned opinion, nor has any state intermediate appellate court.
 
 
 31
 In our search for the answer, we begin with the history of the Compact. In the 1950's social service administrators from several states explored common problems arising from the interstate care and placement of children in foster care or adoptive homes. See The Secretariat to the Association of Administrators of the Interstate Compact on the Placement of Children, Guide to The Interstate Compact on the Placement of Children 3 (1990). Three difficulties were noted: (1) the failure of importation and exportation statutes to provide protection for children moved interstate; (2) the territorial limitation of a state's jurisdiction and the powerlessness of a sending state to ensure proper care and supervision in the receiving state; (3) the absence of the means to compel the receiving state to provide services in support of placement for foster care and adoption. Hartfield, The Role of the Interstate Compact on the Placement of Children in Interstate Adoption, 68 Neb.L.Rev. 292, 295 (1989).
 
 
 32
 In 1960 the Council of State Governments proposed adoption of an Interstate Compact. This vehicle was recommended because when a child was sent out of state, the state of origin lost jurisdiction over the child and supervision became difficult or impossible. See Council of State Governments, Suggested State Legislative Program for 1961 49 (1960). Through a compact the authority of participating states would be extended beyond their borders. In outlining the suggested program, the Council explained, "The compact provides procedures for the interstate placement of children (either by public agencies or by private persons or agencies) when such placement is for foster care or as a preliminary to a possible adoption." Id.
 
 
 33
 As drafted, the Compact provides for notification of appropriate state or local authorities in the receiving state before placement by out-of-state persons and agencies. The authorities in the receiving state are given the opportunity to investigate and, if satisfied, must notify the sending state that the proposed placement does not appear to be contrary to the child's interest. After a placement has been made, the sending state continues to have financial responsibility for support and retains jurisdiction over the child.
 
 
 34
 Proper construction of the Compact begins with a reading of its text. 62 Pa.Stat.Ann. Sec. 761 (Purdon Supp.1990). The most significant and, to our minds, determinative language is found in Article III(a): "No sending agency shall send, bring or cause to be sent or brought into any other party state, any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this article." The scope of the Compact is carefully limited to foster care or dispositions preliminary to an adoption. Article III thus precisely reflects the articulated intention of the Council of State Governments.
 
 
 35
 Article II(d) of the Compact defines "placement" as "the arrangement for the care of a child in a family free or boarding home or in a child caring agency or institution but does not include any institution caring for the mentally ill, mentally defective or epileptic or any institution primarily educational in character, and any hospital or other medical facility." The Compact covers the situations in which a child will live in a family-type home or a child care institution, but not in a hospital or educational establishment. The definition of "placement," therefore, limits the sites where an agency may place a child for care.
 
 
 36
 As stated above, the Compact applies only to substitutes for parental care such as foster care or arrangements preliminary to adoption. Article II lists the places, not the persons, to be designated for child care. In short, Article II provides limitations on application of the Compact; it does not expand its scope beyond that contemplated by the Council of State Governments.
 
 
 37
 Article V of the Compact provides for maintenance of jurisdiction and states that the sending agency "shall continue to have financial responsibility for support and maintenance of the child during the period of the placement." The obligation of continuing support is basic, and failure to observe this duty could deprive a state of jurisdiction. See Florida, Dept. of Health & Rehabilitative Services v. Thornton, 396 S.E.2d 475, 480 (W.Va.1990). To construe the return of a child to his or her parent as a "placement" within the Compact would result in the anomalous situation of imposing a financial obligation upon a sending state that supersedes parents' duty to support their children.
 
 
 38
 Article VIII excludes from the scope of the Compact the sending of a child into a receiving state by certain relatives (including a parent) "or his guardian and leaving the child with any such relative [including a parent]." The word "guardian" is not defined in the statute. Presumably if an agency has been appointed guardian, it can place a child in another state with a parent or other relative designated in the Compact without being affected by its terms.
 
 
 39
 The detailed draftsman's notes, supplied by the Council of State Governments, reinforce the notion that the Compact does not apply to parental placements. The notes state that Article VIII "exempts certain close relatives. This was done in order to protect the social and legal rights of the family and because it is recognized that regulation is desirable only in the absence of adequate family control or in order to forestall conditions which might produce an absence of such control." Draftsman's Notes on Interstate Compact on the Placement of Children, reprinted in R. Hunt, Obstacles to Interstate Adoption 44 (1972).
 
 
 40
 The Council's decision to avoid entanglement with the natural rights of families is consistent with the limited circumstances that justify a state's interference with family life. See, e.g., Moore v. East Cleveland, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982).
 
 
 41
 We are aware that the Association of Administrators of the Compact has adopted Regulation III stating that " '[p]lacement' as defined in Article II(d) includes the arrangement for the care of a child in the home of his parent, other relative, or non-agency guardian in a receiving state when the sending agency is any entity other than a parent, relative, or non-agency guardian making the arrangement for care as a plan exempt under Article VIII(a) of the Compact." See 1 American Pub. Welfare Ass'n, Compact Administrators' Manual at 1.23 [hereinafter Manual ]. As we decipher this regulation, it would define "placement" to include a situation in which a court as the sending agency arranges for a parent in another state to care for her child. The Secretariat to the Association has also issued opinion letters to that effect. See Manual, at 3.61, 3.87, 3.97.
 
 
 42
 The regulation, however, expands the scope of the Compact beyond that set out in Article III. As mentioned above, Article III refers to "placement in foster care or as a preliminary to possible adoption"--neither of which applies to a situation where a child is returned to parental custody.
 
 
 43
 Moreover, the regulation and interpretative letters are inconsistent with the Manual's introduction which reads, "The Compact applies to placements preliminary to possible adoptions, placements in foster care where no adoption is contemplated, and institutional placements of adjudicated delinquents needing special services or programs not available within the state." See Manual, at 1.01.
 
 
 44
 "A regulation cannot be upheld if it is contrary to the statute under which it was promulgated." Consulting Engineers Council v. State Architects Licensure Bd., 522 Pa. 204, 560 A.2d 1375, 1376 (1989). No regulation can override legislative intent and extend beyond the legislative scheme. Commonwealth v. DeFusco, 378 Pa.Super. 442, 549 A.2d 140, 145 (1988), appeal dismissed, 523 Pa. 425, 567 A.2d 1043 (1990). "[I]n any conflict between a statute and a regulation purporting to implement the statutes provision, the regulation must, of course, give way." Tiani v. Commonwealth, 86 Pa. Commw. 640, 486 A.2d 1016, 1017 (1985); Harrison & Bates, Inc. v. LSR Corp., 238 Va. 741, 385 S.E.2d 624, 627 (1989). Reviewed under the above standard, the regulation as it might be applied here is of no effect and the statutory language must govern.
 
 
 45
 We have also reviewed In re Jason Adam Linn, 310 N.C. 151, 312 S.E.2d 648 (1984), a three sentence memorandum opinion reversing a trial court that had held that the Compact did not apply when a mother was physically present in the courtroom. Because the court neither detailed the factual background nor analyzed the Compact language, we do not find the opinion helpful. But see Department of Health and Rehabilitative Services v. In the Interest of M.W., (Fla.App.), 424 So.2d 56 (1982) (by granting legal custody, the trial court in effect dissolved legal dependency status and the Compact no longer applied).
 
 
 46
 In two opinions the Superior Court of Pennsylvania discussed situations in which adoption and child custody determinations were made under the Uniform Child Custody Jurisdiction Act rather than the Compact. See In re Adoption of K.S., 399 Pa.Super. 29, 581 A.2d 659 (1990) and In re Adoption of B.E.W.G. and S.L.W.G., 379 Pa.Super. 264, 549 A.2d 1286 (1988), allocatur denied, 521 Pa. 628, 558 A.2d 530 (1989). Those cases demonstrate that some of the difficulties the Interstate Compact sought to alleviate, such as lack of investigative resources, may be addressed through a request to a court in a receiving state as provided by the Uniform Custody Act. See 42 Pa.Cons.Stat.Ann. Secs. 5341-5366 (Purdon 1986). See also In re Marriage of Slate, 181 Ill.App.3d 110, 129 Ill.Dec. 844, 536 N.E.2d 894 (1989); In re Gloria F., 212 Cal.App.3d 576, 260 Cal.Rptr. 706 (1989). The Uniform Act, therefore, is an alternative source of assistance when interstate jurisdictional concerns are present and supplies an answer for some of the concerns that apparently led the Secretariat to expand its notions of the scope of the Compact.
 
 
 47
 Both Virginia and Pennsylvania have adopted the Uniform Act. Its provisions would have allowed the Pennsylvania courts to order an investigation of the conditions at the Walton home on request of the Virginia court. The Act would have required Pennsylvania courts to recognize the Virginia court order and also would have permitted the Pennsylvania courts to enforce the supervision requested by the Virginia court. See 42 Pa.Cons.Stat.Ann. Secs. 5354, 5360, 5361.
 
 
 48
 We are persuaded that read as a whole the Compact was intended only to govern placing children in substitute arrangements for parental care. Thus, the Compact does not apply when a child is returned by the sending state to a natural parent residing in another state. The language of Article III is unambiguous and, as noted earlier, Article V's requirement that the sending state continue to be financially responsible is inconsistent with the primary obligation of parents.
 
 
 49
 It follows that because the Interstate Compact did not apply in this case, the Compact and the Virginia court order together were not effective in Pennsylvania and did not create a special relationship between Khemsu and defendants.
 
 III.
 
 50
 In the absence of Compact applicability, we are left with a Virginia court order directing Philadelphia officials to supervise Khemsu. But for an order to bind a party, the issuing court must have jurisdiction over that individual. See Hanson v. Denckla, 357 U.S. 235, 249-50, 78 S.Ct. 1228, 1237, 2 L.Ed.2d 1283 (1958); International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); cf. Walker v. Birmingham, 388 U.S. 307, 314, 87 S.Ct. 1824, 1828, 18 L.Ed.2d 1210 (1967). Because Virginia lacked jurisdiction over the Philadelphia social workers, the court order, standing alone, imposed no legal duties on the defendants in Philadelphia.
 
 
 51
 Even if we construe the circumstances as a situation in which the state undertook to conduct supervision under the mistaken belief that the Compact applied, the result would be no different than in DeShaney. There, the county officials actively intervened in the family relationship by having parental custody revoked for a period. Despite the warnings that they had received, the county officials did nothing. Indeed, the social worker in DeShaney noticed suspicious injuries on the child after custody had been returned to the father, but still failed to act.
 
 
 52
 Here, by contrast, the Philadelphia workers had less indication of trouble after the first investigation and the mother's later refusal to cooperate. That is not to say that their announced visitation policy and lack of diligence or concern were satisfactory, but from a constitutional viewpoint they are not actionable in light of DeShaney. Similarly, while the nonaction of the Virginia authorities may be faulted from a humanitarian standpoint, from the legal perspective the court and the agencies there had no authority over the mother after she regained custody in Philadelphia. As the Court stated in DeShaney, the fact that the "state functionaries ... stood by and did nothing when suspicious circumstances dictated a more active role for them" does not make out a claim under the Due Process Clause. 489 U.S. at 203, 109 S.Ct. at 1007.
 
 IV.
 
 53
 In another attempt to avoid DeShaney, plaintiff asserts that the Philadelphia Department's actions actively created a dangerous situation. See, e.g., Ross v. United States, 910 F.2d 1422 (7th Cir.1990) (state can be liable when it actively cuts off sources of private help). That contention, however, is not supported by the record.
 
 
 54
 Defendants' errors here were ones of omission, rather than commission. The record shows clearly that defendants did nothing, and by inaction made it possible for the mother to harm her son. The active conduct of the Philadelphia workers in investigating the Walton home occurred before Khemsu's return. At that time, conditions appeared satisfactory. The social workers' later inaction allowed a dangerous situation to ripen. That inaction and its tragic consequences are nevertheless within the scope of DeShaney's holding.
 
 V.
 
 55
 Finally, plaintiff contends that Pennsylvania treats children placed in foster care differently than children placed in the custody of their parents, and that this disparity somehow violates the Equal Protection Clause of the United States Constitution. This argument lacks merit.
 
 
 56
 The state's differing responsibilities toward both classes of children justifies the asserted variance in treatment. Generally speaking, absent compelling circumstances the state may not interfere with the parent-child relationship. Moore v. East Cleveland, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). Indeed, unjustified intrusion into the family may subject the state to liability. See, e.g., K.H. v. Morgan, 914 F.2d 846, 853 (7th Cir.1990) ("State employees who withhold a child from her family run the risk of being sued by the family for infringing their liberty of familial association.").
 
 
 57
 In contrast, the foster parent-child relationship is created by the state and as such is defined by state law. See Smith v. Org. of Foster Families, 431 U.S. 816, 845-46, 97 S.Ct. 2094, 2110, 53 L.Ed.2d 14 (1977). The state may have a duty to oversee foster parents. See, e.g., Taylor v. Ledbetter, 818 F.2d 791 (11th Cir.1987) (en banc), cert. denied, 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989).
 
 
 58
 We conclude that the district court properly found DeShaney to be controlling. Accordingly, the judgment will be affirmed.