The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
September 11, 2025

## 2025COA78

**No. 25CA0282, *People in Interest of O.J.R.* — Family Law — Dependency and Neglect — Interstate Compact on Placement of Children — Revised Interstate Compact on Placement of Children**

In this dependency and neglect case, a division of the court of appeals addresses two novel issues. First, the division determines that the Revised Interstate Compact on Placement of Children is not currently in effect in Colorado. Second, the division concludes that the existing Interstate Compact on Placement of Children does not apply when a court grants custody of a child to an out-of-state parent.

COLORADO COURT OF APPEALS 2025COA78

Court of Appeals No. 25CA0282
City and County of Denver Juvenile Court No. 24JV30654
Honorable Laurie A. Clark, Judge

The People of the State of Colorado,

Appellee,

In the Interest of O.J.R., a Child,

and Concerning P.A.R.,

Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE SCHUTZ
Fox and Taubman*, JJ., concur

Announced September 11, 2025

Michiko Ando Brown, City Attorney, Amy J. Packer, Assistant City Attorney, Denver, Colorado, for Appellee

Samantha Metsger, Guardian Ad Litem

Beth Padilla, Office of Respondent Parents' Counsel, Durango, Colorado, for Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1 In this dependency and neglect proceeding, P.A.R. (father) appeals the juvenile court's judgment adjudicating O.J.R. (the child) dependent or neglected and entering the initial disposition. The resolution of this dispute requires us to determine two novel issues. First, we must address whether the Revised Interstate Compact on Placement of Children (Revised ICPC) is currently in effect in Colorado. We conclude that it isn't. Second, we consider whether the provisions of the current Interstate Compact on Placement of Children (ICPC)[1] apply when a court grants custody of a child to an out-of-state parent. We conclude that they do not.

¶ 2 We therefore determine that the juvenile court erred by applying the provisions of the Revised ICPC to this case because they are not yet effective or binding. Nonetheless, the error was harmless because the requirements of the current ICPC do not apply when a court grants custody of a child to an out-of-state parent. And, because father's remaining appellate claims do not warrant reversal, we affirm the judgment.

---

[1] As explained more fully in Part II.B *infra*, the ICPC governs the interstate "placement" of children and corresponding provision of services to children involved in dependency and neglect cases.

1

## I. Background

¶ 3     In July 2024, the Denver Department of Human Services filed a petition in dependency and neglect concerning the then-eight-year-old child.  The Department alleged that a few days earlier, the police responded after a third party found the child "actively bleeding" with cuts on his face.  The child reported that his father had punched him and hit him with a belt, causing injuries to his face and legs.  The child was transported to the hospital by ambulance.  His facial injuries required stitches.

¶ 4     In the petition, the Department noted that the child's mother had never lived in Colorado and was not in the home when the child's injuries occurred.  However, both parents had a history of child welfare referrals.

¶ 5     Mother and father had also been engaged in lengthy and contentious custody proceedings regarding the child in New York.  In February 2023, the New York court granted primary custody of the child to father, with mother granted parenting time during summer, winter, and spring breaks.  In May 2024, father registered the New York custody order in Colorado and obtained a temporary order limiting mother's parenting time to supervised visits in

Colorado.[2]  The Colorado domestic relations court subsequently certified the ongoing custody proceedings into this dependency and neglect case.

¶ 6     Initially, the juvenile court granted temporary legal custody of the child to the Department, and he was placed in foster care. Within two weeks, mother requested that the child be placed with her.  Shortly after that, the foster parents requested removal of the child from their home within thirty days.

---

[2] At the initial shelter hearing, the juvenile court found that it had temporary emergency jurisdiction based on the allegations in the petition.  *See* § 14-13-204(1), C.R.S. 2025 (providing that a court has jurisdiction if it is "necessary in an emergency to protect the child because the child . . . is subjected to or threatened with mistreatment or abuse").  However, the court noted that it was necessary to determine if Colorado had ongoing jurisdiction over the case.  At the next hearing, the juvenile court informed the parties that it had spoken to the New York domestic relations judge.  The New York judge told the court that she had issued an order "waiving" New York's jurisdiction in December 2023 because by that point, the child had been living in Colorado for at least six months and Colorado was a "more appropriate jurisdiction." Neither party contests these statements or the juvenile court's continuing exercise of jurisdiction.  Given this record, we are satisfied that the juvenile court had jurisdiction to modify the New York orders and hear this case pursuant to section 14-13-203(1)(a), C.R.S. 2025 (permitting a Colorado court to modify child-custody orders from another state if that state determines it no longer has continuing exclusive jurisdiction or that Colorado would be a more convenient forum).

¶ 7 In August 2024, the juvenile court held a contested placement hearing. At the end of the hearing, the court found that a home study for mother was not required under the "ICPC modifications," which, as explained below, we construe as a reference to the Revised ICPC. The court then granted mother's request for temporary legal and physical custody of the child. After the hearing, the child was returned to mother's home in New York.

¶ 8 Approximately one month later, father requested that his counsel withdraw so he could represent himself. The juvenile court granted the request. Around the same time, mother entered into a deferred adjudication, admitting that the child had received improper care through no fault of her own. Father denied the petition and requested an adjudicatory hearing.

¶ 9 In November 2024, the juvenile court held a contested adjudicatory hearing concerning only father. Father appeared and represented himself. The court found that the child was dependent or neglected. The court later held a dispositional hearing and adopted a treatment plan for father.

¶ 10 Father appeals the juvenile court's decisions granting custody of the child to mother in New York, adjudicating the child

4

dependent or neglected, and adopting the initial treatment plan for him.

## II. Order Granting Mother Custody

¶ 11 Father first contends that the juvenile court erred by misapplying the ICPC and granting custody of the child to mother before an ICPC home study had been completed. Specifically, he argues that the court improperly applied the Revised ICPC because it was not in effect when the placement hearing occurred. He also argues that under the current version of the ICPC, a home study was required before the court could grant custody of the child to mother in New York.

¶ 12 We agree that the juvenile court improperly applied the Revised ICPC. Nonetheless, we conclude the error was harmless because the current ICPC does not apply when a court grants custody[3] of a child to an out-of-state parent.

---

[3] Our conclusion is not limited to cases in which a court grants "legal custody," as defined by section 19-1-103(94)(a), C.R.S. 2025, to a parent. Rather, the term "custody," as used in this opinion, includes an award of either legal or physical custody to a parent. Thus, even when a court grants legal custody of a child to a department of human services but "places" the child with an out-of-state parent, the ICPC does not apply.

## A. Standard of Review

¶ 13     Whether the juvenile court properly applied the ICPC is a question of law that we review de novo. *See People in Interest of I.J.O.*, 2019 COA 151, ¶ 6. We also review questions of statutory interpretation de novo. *People in Interest of B.C.B.*, 2025 CO 28, ¶ 24.

¶ 14     When interpreting statutes, we seek to discern and effectuate the legislature's intent. *Id.* In doing so, we apply words and phrases according to their plain and ordinary meanings, and we consider the entire statutory scheme to give consistent, harmonious, and sensible effect to all its parts. *Id.* If the statutory language is unambiguous, we apply it as written, and we need not resort to other rules of statutory construction. *Id.* In construing a statute, we must respect the legislature's choice of language and refrain from adding words to the statute or subtracting from it. *Id.* at ¶ 25.

## B. The Revised ICPC is Not Currently Effective in Colorado

¶ 15     The ICPC is an interstate agreement approved by all fifty states, the District of Columbia, and the U.S. Virgin Islands. *See I.J.O.*, ¶ 9. The purpose of the ICPC is to facilitate interstate

cooperation and coordination in the placement of, and provision of services to, children being placed by one state's child protective services agency in another state. *Id.*

¶ 16    Colorado enacted the ICPC in 1975, and it was codified at sections 24-60-1801 to -1803, C.R.S. 1975. *See* Ch. 224, sec. 1, §§ 24-60-1801 to -1803, 1975 Colo. Sess. Laws 844-49. The original language of the ICPC remained codified in sections 24-60-1801 to -1803 until August 2024, when Colorado became the eighteenth state to enact the Revised ICPC.[4] In doing so, the legislature included language that will have the effect of repealing and reenacting, with amendments, part 18 of article 60 of title 24. *See* Ch. 248, sec. 2, §§ 24-60-1801 to -1804, 2024 Colo. Sess. Laws 1628-51.

¶ 17    However, the legislation specifically provides that the Revised ICPC is not immediately effective:

> The [Revised ICPC] shall become effective and binding upon legislative enactment of the compact into law by no less than 35 states. The effective date shall be the later of July 1, 2007, or upon enactment of the compact into

---

[4] The Revised ICPC was drafted by the American Public Human Services Association (APHSA) in 2006. *See* APHSA, *History of the ICPC*, https://perma.cc/39WY-3S2B.

7

> law by the 35th state.  Thereafter it shall
> become effective and binding as to any other
> member state upon enactment of the compact
> into law by that state.

§ 24-60-1802, art. XIV(B), C.R.S. 2025.  Section 24-60-1804, C.R.S. 2025, reiterates, "Section 2 of Senate Bill 24-125, enacted in 2024, will take effect on the date the [Revised ICPC] is enacted into law in the thirty-fifth compact state."  To date, only eighteen states have adopted the Revised ICPC.  *See* APHSA, *Revised ICPC*, https://perma.cc/FZN4-9RZA.  Consequently, although the language of the Revised ICPC presently appears in sections 24-60-1801 to -1804 of Colorado's current revised statutes, the Revised ICPC is not yet in effect or binding.

¶ 18    Thus, we conclude that the language of the prior version of the ICPC, sections 24-6-1801 to -1803, C.R.S. 2023, remains in effect. This conclusion is consistent with the plain language of section 24-60-1804.  And, to the extent this language permits any ambiguity, the legislative history of H.B. 25-1086 reveals that the intent of section 24-60-1804 was to "clarif[y] that the existing [ICPC] remains in effect until the updated version is enacted by 35 states."  Legis. Council of the Colo. Gen. Assembly, Fiscal Note on H.B. 25-1086, at

8

1 (Jan. 30, 2025); *see* Ch. 60, sec. 1, § 24-60-1804, 2025 Colo. Sess. Laws 251.

¶ 19    In sum, the Revised ICPC will not take effect in Colorado until it has been enacted into law by thirty-five states.  Unless and until that happens, juvenile courts in Colorado must apply the language of sections 24-60-1801 to -1803, C.R.S. 2023, when addressing the interstate placement of children.

### C.    The ICPC Does Not Apply to Orders Granting Custody to Out-of-State Parents

¶ 20    No reported Colorado case has determined whether the provisions of the ICPC apply when custody of a child is granted to an out-of-state parent.  Courts from other states have reached different conclusions in resolving this issue.  *Compare* Kurtis A. Kemper, *Construction and Application of Interstate Compact on the Placement of Children*, 5 A.L.R. 6th 193, § 6 (2005) (discussing cases holding that the ICPC applies to out-of-state placement with a natural parent), *and Green v. Div. of Fam. Servs.*, 864 A.2d 921, 926-27 (Del. 2004) (concluding that the ICPC should be read to encompass placement of a child with a noncustodial parent), *with* Kemper, § 7 (discussing cases holding that the ICPC does not apply

9

to such placements), *and In re Alexis O.*, 959 A.2d 176, 182 (N.H. 2008) (concluding that the ICPC was intended only to govern placements of children in substitute arrangements for parental care, which does not include returning a child to a natural parent). We now address the issue and conclude that the ICPC does not apply when a court grants custody of a child to a parent.

¶ 21    The ICPC governs the "interstate placement of children." § 24-60-1802, art. I, C.R.S. 2023. Thus, the definition of "placement" is central to discerning the ICPC's reach. The ICPC defines "[p]lacement" as "the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution." § 24-60-1802, art. II(d), C.R.S. 2023. This language, on its own, is somewhat unclear, particularly "family free" home, which is not defined by the ICPC. *See In re R.S.*, 215 A.3d 392, 404 (Md. Ct. Spec. App. 2019) (acknowledging that the definition of "family free" is not clear), *aff'd*, 235 A.3d 914 (Md. 2020); *In re C.B.*, 116 Cal. Rptr. 3d 294, 299 (Ct. App. 2010) (stating that "family free home" is not a term of art, and its meaning is by no means clear on its face). *But see Alexis O.*, 959 A.2d at 182 ("Although the term 'family free' home is not defined, in context it refers to a home that

10

provides care for a child similar to that which a family would provide, but that, unlike a boarding home, charges no fee for this care.").

¶ 22    But the ICPC provides additional guidance through provisions that address conditions for placement.  Specifically, article III of the ICPC provides as follows:

> (a) No sending agency shall send, bring, or cause to be sent or brought into any other party state any child *for placement in foster care or as a preliminary to a possible adoption* unless the sending agency shall comply with each and every requirement set forth in this article and with the applicable laws of the receiving state governing the placement of the children therein.
>
> (b) Prior to sending, bringing, or causing any child to be sent or brought into a receiving state *for placement in foster care or as a preliminary to a possible adoption*, the sending agency shall furnish the appropriate public authorities in the receiving state written notice of the intention to send, bring, or place the child in the receiving state.

§ 24-60-1802, art. III(a)-(b), C.R.S. 2023 (emphasis added).  And, although the ICPC does not define "foster care" or "adoption," the plain meaning of those terms does not include an award of custody to a parent.

11

¶ 23    This conclusion is consistent with Colorado's statutory definition of "[f]oster care." The Children's Code defines "foster care" as

> the placement of a child or youth into the legal custody or legal authority of a county department of human or social services for physical placement of the child or youth in a kinship care placement; supervised independent living placement, as defined in section 19-7-302[, C.R.S. 2025]; or certified or licensed facility, or the physical placement of a juvenile committed to the custody of the state department of human services into a community placement.

§ 19-1-103(66), C.R.S. 2025.

¶ 24    Thus, "placement in foster care" does not include placement with parents. *See R.S.*, 215 A.3d at 405 (referring to Maryland's statutory definition of "foster care" in concluding that the ICPC's definition of "placement" does not encompass a child's out-of-state placement with a parent); *see also In re Emoni W.*, 48 A.3d 1, 7-8 (Conn. 2012) ("Children in the care of their own parents are not in 'foster care' in any ordinary sense of that phrase, and parents are not required to adopt their own children.").

¶ 25    Moreover, to the extent that the ICPC placement provisions create any ambiguity, the original drafter's notes, supplied by the

12

Council of State Governments, "reinforce the notion that the [ICPC] does not apply to parental placements." *McComb v. Wambaugh*, 934 F.2d 474, 481 (3d Cir. 1991). These notes explain that the ICPC "exempts certain close relatives . . . in order to protect the social and legal rights of the family and because it is recognized that regulation is desirable only in the absence of adequate family control or in order to forestall conditions which might produce an absence of such control." *Id.* (citation omitted). The purpose of this exemption is to limit the state's unnecessary intrusion into family life. *Id.* (citing *Moore v. City of East Cleveland*, 431 U.S. 494 (1977)). This deference is at its zenith when the proposed custody award is to a parent. *See id.* (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)); *see also Alexis O.*, 959 A.2d at 183.

¶ 26    In sum, we conclude that the plain language of section 24-60-1802, C.R.S. 2023, limits the applicability of the ICPC to cases in which children are placed for foster care or adoption. In other words, it applies to substitutes for parental care that are not implicated when custody of a child is granted to a parent.

¶ 27    We acknowledge that our interpretation of the ICPC conflicts with "Regulation 3" promulgated by the Association of

Administrators of the Interstate Compact on the Placement of Children (AAICPC) and adopted in Colorado through Department of Human Services Rule 7.307.1, 12 Code Colo. Regs. 2509-4. The AAICPC's Regulation 3 states in pertinent part that compliance with the ICPC is required for "[p]lacements with parents and relatives when a parent or relative is not making the placement." AAICPC, Regulation 3(2)(a)(3) (effective Oct. 1, 2011), https://perma.cc/82ME-QNBV. Likewise, we acknowledge that our interpretation of the ICPC conflicts with the Colorado Department of Human Services' rules implementing ICPC Regulations 3, which provide that the ICPC procedures "shall be initiated for children who are considered for placement out-of-state for . . . [h]omes of parents." Dep't of Hum. Servs. Rule 7.307.31(B), 12 Code Colo. Regs. 2509-4. However, in light of our conclusion that the relevant text of the ICPC unambiguously confines its application to placements of children in foster care or as preliminaries to adoption, both ICPC Regulation 3(2)(a) and Department of Human Services Rule 7.307.31(B), 12 Code Colo. Regs. 2509-4, are inconsistent with the enabling legislation and, therefore, cannot be given effect. *See B.C.B.*, ¶ 27 ("In conducting our statutory

14

analysis, we may consider an administrative agency's interpretation of the statute, but we are not bound by this interpretation, and we will not defer to it if it conflicts with the statute's plain language."); *see also D.L. v. S.B.*, 201 N.E.3d 771, 777 (N.Y. 2022) (concluding that ICPC Regulation 3 cannot be given effect because it is inconsistent with the language of the ICPC); *R.S.*, 215 A.3d at 406-07 (concluding that Regulation 3 is invalid to the extent it purports to expand application of the ICPC to out-of-state placements with a parent).

¶ 28    Moreover, our conclusion does not excuse Colorado juvenile courts and departments of human services from ensuring that children are safe when placed with out-of-state parents. Rather, when making any placement or custody decision, a juvenile court must consider the overriding purpose of the Children's Code, which is to protect a child's safety and welfare by providing procedures to serve the child's best interests. *See L.G. v. People in Interest of K.G.*, 890 P.2d 647, 654 (Colo. 1995). And a juvenile court's paramount concern in a dependency and neglect case must be to protect a child from any further harm as the result of abuse or neglect. *Id.*

¶ 29    More specifically, before an adjudication has been entered and after notice to the parents, a juvenile court may hold a hearing and enter temporary orders for the custody and protection of a child so long as such orders are in the child's best interests.  *See* § 19-1-104(3)(a), C.R.S. 2025.  And, after an adjudication has been entered, a juvenile court "may place the child in the legal custody of one or both parents . . . , with or without protective supervision, under such conditions as the court deems necessary and appropriate." § 19-3-508(1)(a), C.R.S. 2025.

¶ 30    Based on the foregoing, we join those states holding that the ICPC does not apply when a court grants custody of a child to an out-of-state parent.  *See D.L.*, 201 N.E.3d at 775 (the clear language of the ICPC limits its applicability to cases of placement for foster care or adoption, which do not include custody with out-of-state parents); *R.S.*, 215 A.3d at 396 (the ICPC does not apply to the out-of-state placement of a child with a biological parent); *In Interest of C.R.-A.A.*, 521 S.W.3d 893, 903 (Tex. App. 2017) (The plain language of the ICPC shows "it is inapplicable to an interstate placement of a child with a parent."); *In re S.R.C.-Q.*, 367 P.3d 1276, 1282 (Kan. Ct. App. 2016) ("[T]he ICPC applies only to out-of-state

16

placements of children with foster care or as a preliminary to a possible adoption, not to out-of-state placements with a parent."); *In re D.B.*, 43 N.E.3d 599, 604 (Ind. Ct. App. 2015) ("[T]he statute quite plainly provides that it applies only to placement in foster care or a preadoptive home. A biological parent is neither of these."); *Emoni W.*, 48 A.3d at 7-8 ("[T]he ordinary meaning of the [ICPC's language] does not encompass placement with a noncustodial parent."); *C.B.*, 116 Cal. Rptr. 3d at 302 (An "out-of-state placement with a parent is *never* subject to the ICPC."); *Alexis O.*, 959 A.2d at 182 (The language of the ICPC shows that it "does not apply to care for a child by his or her natural parent.").

### D.    Application to the Current Case

¶ 31    We now turn to the juvenile court's ruling. Recall that the court expressly applied the "ICPC modifications." Specifically, it found that an ICPC home study was unnecessary because mother qualified as a "non-custodial parent." But the language about non-custodial parents appears only in article III of the Revised ICPC, not the current ICPC. *Compare* § 24-60-1802, art. III(B)(5), C.R.S. 2025, *with* § 24-60-1802, art. III, C.R.S. 2023. Thus, when read in context, it is clear that the juvenile court was referring to and

17

applying the Revised ICPC when it found that an ICPC home study was not required before granting temporary physical and legal custody of the child to mother in New York. In doing so, the court erroneously relied on the language of the Revised ICPC because that language is not yet effective.[5] *See* §§ 24-60-1802, art. XIV(B), -1804, C.R.S. 2025.

¶ 32     Nonetheless, as explained above, the provisions of the ICPC were not triggered when the juvenile court granted custody of the child to mother in New York. *See* § 24-60-1802, arts. II(d), III(a)-(b), C.R.S. 2023. Thus, we discern no reversible error in the court's finding that an ICPC home study was unnecessary before granting custody to mother.

¶ 33     Moreover, consistent with its general obligations under the Children's Code, the record indicates that the Department had taken steps to ensure that granting mother custody was safe for the child. *See* § 19-3-508(1)(a). Specifically, the Department flew a

---

[5] We recognize that at various times throughout the proceedings, the parties argued that the juvenile court was required to relinquish jurisdiction upon granting custody to mother. However, these arguments were based on the provisions of the Revised ICPC. We need not address these arguments in light of our conclusion that the Revised ICPC is not yet effective.

18

caseworker to New York to visit mother's home prior to the placement hearing. After inspecting mother's home and meeting with everyone who lived there, the caseworker had no safety concerns. Another caseworker testified that she had been in contact with the New York Department of Social Services and that a New York casework supervisor had agreed to conduct courtesy home visits if the court granted custody to mother. The Colorado caseworker stated that if the child was placed with mother in New York, she planned to conduct weekly phone calls with the child and could fly to New York to do face-to-face visits when necessary.

¶ 34 Additionally, before granting temporary custody to mother, the juvenile court considered the child's safety, as evidenced by its entry of several protective orders. Specifically, the court ordered that mother refrain from any use of corporal punishment, abstain from excessive use of alcohol or drugs around the child, and ensure that the child have no contact with mother's ex-boyfriend. The court also noted that the Department would be required to continue working with the New York Department of Human Services "in regards [sic] to making sure that [the child] is safe."

¶ 35    Accordingly, the court's erroneous application of the Revised ICPC was harmless because the court had the authority to grant custody of the child to mother in New York and because it entered temporary orders to ensure that the custody arrangement was safe and in the child's best interests. *See* § 19-1-104(3)(a).

### III.    Child Hearsay

¶ 36    Father next contends that at the adjudicatory hearing, the juvenile court erred by eliciting and considering the child's out-of-court statements that constituted inadmissible hearsay. However, father concedes that he did not preserve this claim for appeal. Indeed, he did not object when the court directed a witness — the child's discharge nurse — to review her notes for any statements the child made to other medical professionals about the cause of his injuries and to summarize those statements for the court.

¶ 37    Nevertheless, father urges us to review his appellate claim to avoid a miscarriage of justice, specifically arguing that there was a "power imbalance between [the judge] directly questioning a witness . . . and a pro se litigant's ability to object to such questioning." But the miscarriage of justice exception is a high bar and narrow in scope, applying only to limited situations in which an error by the

juvenile court — not otherwise properly preserved for appeal — results in a grossly unfair outcome for the parent. *See People in Interest of M.B.*, 2020 COA 13, ¶¶ 23-24; *see also People in Interest of A.E.*, 914 P.2d 534, 539 (Colo. App. 1996). Father's arguments do not establish that the court's adjudicatory judgment created such a result.

¶ 38 Moreover, even if the court had excluded the child's statements, its finding that the child was dependent or neglected was supported by the remaining evidence. Specifically, father's own testimony — that he did not know where his son was when the third party found him, or how his injuries occurred — supported the court's findings that the child lacked proper parental care through father's actions or omissions, *see* § 19-3-102(1)(b), C.R.S. 2025, and that the child had run away from home or was beyond father's control, *see* § 19-3-102(1)(f). And section 19-3-102 requires proof of only one of its provisions to support an adjudication. *See People in Interest of S.M-L.*, 2016 COA 173, ¶ 29, *aff'd sub nom.*, *People in Interest of R.S. v. G.S.*, 2018 CO 31.

¶ 39    Based on the foregoing, we discern no miscarriage of justice and therefore decline to address father's hearsay objection asserted for the first time on appeal.

### IV.    Treatment Plan

¶ 40    Father also contends that the juvenile court erred by not approving an appropriate treatment plan at the initial dispositional hearing.  We are not persuaded.

¶ 41    The purpose of a treatment plan is to preserve the parent-child legal relationship by assisting the parent in overcoming the problems that required intervention into the family.  *People in Interest of K.B.,* 2016 COA 21, ¶ 11.  Thus, an appropriate treatment plan is one that is approved by the court, relates to the child's needs, and is reasonably calculated to render the parent fit to provide adequate parenting to the child within a reasonable time.  § 19-1-103(12); *K.B.,* ¶ 13.  A juvenile court must measure the appropriateness of a treatment plan by its likelihood of success in reuniting the family, which is assessed based on the facts existing at the time the court approves the plan.  *People in Interest of B.C.,* 122 P.3d 1067, 1071 (Colo. App. 2005).

¶ 42    Here, the juvenile court held a dispositional hearing at which father appeared and represented himself. Prior to that hearing, the Department filed a proposed treatment plan, which required father to address his use of corporal punishment and physical discipline, demonstrate that he could meet the child's needs, and cooperate with the Department. The guardian ad litem (GAL) requested specific amendments to the proposed treatment plan. After discussing the proposed plan with father, the court adopted it.

¶ 43    Father does not argue that the treatment plan was generally inappropriate because it was not reasonably calculated to render him fit to provide adequate parenting to the child within a reasonable time or because it did not relate to the child's needs. *See K.B.*, ¶ 13. Rather, he makes three more narrow arguments, which we address and reject.

¶ 44    First, we disagree with father's contention that the juvenile court did not clarify whether it intended to adopt the modifications suggested by the GAL. At the beginning of the hearing, the Department noted that the GAL had suggested some amendments to the treatment plan, and the Department specifically requested that the court adopt the "treatment plan with the amendments."

The GAL then explained the three proposed amendments: (1) that an action step be added to require father to engage in parenting education that focuses on safe discipline practices; (2) that an action step be added to require father to refrain from telling secrets or whispering to the child during parenting time; and (3) that an objective be added to require father to address his mental health issues.

¶ 45 After discussing the suggested amendments with father, the court stated that it was "going to adopt the treatment plan as recommend[ed]." Thus, the record indicates that the juvenile court did, in fact, adopt the GAL's proposed amendments as part of father's treatment plan. And, consistent with the juvenile court's order, the caseworker's subsequent court report and treatment plan update expressly included the amendments.

¶ 46 Next, we reject father's argument that the treatment plan was inappropriate because it included duplicative services. Although father stated he had already completed online, self-paced parenting classes, the juvenile court explained that those classes were not sufficient because nobody monitored father's progress and level of engagement. Thus, the court concluded that it was appropriate to

24

require father to engage in a parenting program that had professionals who could provide updates on father's engagement. We discern no error in this ruling.

¶ 47 Last, we reject father's argument that the juvenile court "improperly engaged in burden shifting" by requiring him to obtain a referral for family therapy. Although we agree with father that the Department is generally obligated to provide referrals for services required by a treatment plan, *see* § 19-3-208, C.R.S. 2025, we disagree with his interpretation of the court's orders regarding family therapy. At the dispositional hearing, father stated that he believed "group therapy" with the child could be helpful, but he did not request that it be added to the treatment plan. In response, the court stated that if father would "like to get [his] provider to recommend someone, that's absolutely appropriate" and that the parties could "take [father's] lead" in terms of family therapy. But the court did not say that family therapy would be required as part of father's treatment plan. Thus, the court did not require father to obtain a referral for a service required by his treatment plan, and we discern no "improper burden shifting" in the court's order adopting the plan.

¶ 48     Based on the foregoing, we discern no error in the juvenile court's order adopting father's initial treatment plan.

## V.    Disposition

¶ 49     The judgment is affirmed.

JUDGE FOX and JUDGE TAUBMAN concur.