25CA1988 Peo in Interest of AC 04-23-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA1988
Mesa County District Court No. 23JV55
Honorable Craig P. Henderson, Judge

The People of the State of Colorado,

Appellee,

In the Interest of A.C., a Child,

and Concerning M.C.,

Appellant.

JUDGMENT AFFIRMED

Division A
Opinion by JUDGE ASHBY*
Román, C.J., and Martinez*, J., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 23, 2026

Todd M. Starr, County Attorney, John Rhoads, Assistant County Attorney, Grand Junction, Colorado for Appellee

Josie L. Burt, Guardian Ad Litem

Patrick R. Henson, Office of Respondent Parents' Counsel, Justin Twardowski, Office of Respondent Parents' Counsel, Denver, Colorado for Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1    In this dependency and neglect proceeding, M.C. (father) appeals the judgment terminating his parent-child legal relationship with A.C. (the child).  We affirm.

## I.    Background

¶ 2    The Mesa County Department of Human Services opened this case based on concerns about domestic violence and neglect of the child, who was four years old at the time.  The child's paternal grandparents (grandparents) expressed an interest in caring for him early in the case.  The grandparents lived in Connecticut for the duration of the case.

¶ 3    The juvenile court adjudicated the child dependent or neglected.

¶ 4    The grandparents had video visits with the child for several months as well as one in-person visit during the case.  Shortly after the video visits began, the juvenile court ordered visits to be held in a therapeutic setting due to concerns about the child's reactions to the visits.

¶ 5    Nearly a year into the case, an Interstate Compact on Placement of Children (ICPC) home study of the grandparents' home

was approved. Later, the court permitted the grandparents to intervene in the case.

¶ 6 The Department moved to terminate father's parental rights. Following a hearing over two years after the case opened, the court terminated father's parent-child legal relationship with the child.

## II. Less Drastic Alternatives

¶ 7 Father contends that the juvenile court erred by finding that there was no less drastic alternative to termination when placement with the grandparents had been approved by the ICPC home study and the grandparents were willing to participate in an allocation of parental responsibilities (APR). We are not persuaded.

### A. Legal Framework and Standard of Review

¶ 8 A juvenile court may terminate a parent's parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent has not reasonably complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 9    Before terminating parental rights under section 19-3-604(1)(c), the court must also consider and eliminate less drastic alternatives.  *People in Interest of L.M.*, 2018 COA 57M, ¶ 24. In considering less drastic alternatives, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs.  § 19-3-604(3); *see L.M.*, ¶ 29.

¶ 10    Even when a placement provider is willing to enter into an APR with a parent, the court may properly determine that such an arrangement does not adequately meet the needs of a child.  *See People in Interest of T.E.M.*, 124 P.3d 905, 910 (Colo. App. 2005) (a permanent placement with a relative may not be a viable alternative if it does not provide adequate permanence or otherwise meet the child's needs); *People in Interest of D.B-J.*, 89 P.3d 530, 532 (Colo. App. 2004) (a proposed placement is not a less drastic alternative if the placement provider lacks appreciation of a child's needs and conditions).

¶ 11    For a less drastic alternative to be viable, it must do more than "adequate[ly]" meet a child's needs; rather, the less drastic alternative must be the "best" option for the child.  *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 27.  Thus, if the court considers a

less drastic alternative but finds instead that termination is in the child's best interests, it must reject the alternative and order termination. *Id.* at ¶ 32. Under those circumstances, we must affirm the court's decision if its findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

## B.     Analysis

¶ 12     The juvenile court considered the possibility of an APR to the grandparents. In doing so, it explicitly considered that placement in their home had been approved by an ICPC home study. However, the court found that a placement with the grandparents would not meet the child's needs, including his need for a higher level of parenting. *See T.E.M.*, 124 P.3d at 910. It found that they did not adequately appreciate the child's needs or have the "wherewithal" to properly care for him. *See D.B-J.*, 89 P.3d at 532. And the court was concerned the child would not achieve "ultimate permanency" in a placement with the grandparents. *See T.E.M.*, 124 P.3d at 910; *see also People in Interest of Z.M.*, 2020 COA 3M, ¶ 30 ("Permanent placement is not a viable less drastic alternative if the child needs a stable, permanent home that can only be assured by adoption."). It found that the child had been "stuck in a period

of uncertainty during the pendency of this case" and needed finality.

¶ 13    The court thus determined that termination, rather than placement with the grandparents, was in the child's best interests. *See A.M.,* ¶ 32.

¶ 14    The record supports the court's findings.  The child had been diagnosed with an intellectual developmental delay and received play therapy, occupational therapy, and services from a behavioral specialist.  His play therapist opined that he required a higher level of parenting.  While the child had struggled with "severe" behaviors when he started play therapy, he had made steady progress.  But after his visits with the grandparents began, the therapist observed "wild swings" in his behaviors, and the child had become "very physically violent."

¶ 15    The caseworker opined that the grandparents did not fully understand the child's needs and questioned whether they were "fully equipped" to meet them.  For example, the grandparents had purchased a crib for the child, though he was four years old when the case opened.

¶ 16     The grandparents had just one in-person visit during the case, which took place over a weekend.  While they saw the child on Friday and Saturday, they declined an opportunity to visit with him on Sunday to prepare for their Monday flight.  According to the caseworker, the child "rarely respond[ed]" to grandmother during the visit.  The grandparents missed their flight for a scheduled second in-person visit, declined an offer to reschedule, and never followed up to visit another time.

¶ 17     The therapeutic visitation provider opined that the grandparents had a difficult time connecting with the child during video visits.  At times, they engaged themselves in conversations unrelated to the child or muted their audio.  And the provider believed that grandmother sought out "validation" from the child.

¶ 18     Moreover, when a child is under six years old, the expedited permanency planning (EPP) provisions require that they be placed in a permanent home as expeditiously as possible.

¶ 19     *See* §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2025. This case was subject to the EPP provisions due to the child's age and had been open for over two years at the time of the termination hearing.  The caseworker opined that the child needed a

"permanent safe home" for his development. *See* § 19-1-102(1.6).

She described, however, that the grandparents' "ultimate goal" was to return the child to his parents, even if that occurred "several years down the road." *See T.E.M.*, 124 P.3d at 910. Yet the child's parents had not seen him for nearly two years at the time of the termination hearing.

¶ 20 Still, father asserts that placement with the grandparents had been approved by the ICPC home study. *See People in Interest of O.J.R.*, 2025 COA 78, ¶ 15 (the ICPC is an interstate agreement with the purpose of facilitating interstate coordination in the placement of children being placed by one state's child protective services agency in another state). But, as the court recognized, a placement's adequacy for purposes of the ICPC does not equate to the placement being in the child's best interests. *See A.M.*, ¶ 27.

¶ 21 Father also contends that the grandparents were willing and available for placement, relying on evidence of their interest in and preparation for acting in that capacity. But the court weighed all the evidence and ultimately concluded that such a placement would not be in the child's best interests. The record supports the court's findings, and it is not our role to reweigh the evidence nor

substitute our judgment for that of the juvenile court. *See People in Interest of S.Z.S.*, 2022 COA 133, ¶ 29; *cf. People in Interest of A.J.L.*, 243 P.3d 244, 250 (Colo. 2010) ("[I]t is important to defer to the [juvenile] court . . . when it hears contradictory testimony on material issues . . . .").

¶ 22     Father next contends that the Department did not make "significant effort[s]" to advance the grandparents as a placement option and to preserve the family unit. *See* § 19-1-102(1)(b) (one purpose of the Children's Code is to "preserve and strengthen family ties whenever possible"). For instance, father asserts that the grandparents were not informed of concerns about the child's exacerbated behaviors — that coincided with the start of video visits — until four months after visits began. But the record shows that the child's behaviors had been discussed with the grandparents earlier than father suggests and, in any case, visits were quickly transitioned to a therapeutic setting due to the behavioral concerns. The Department also made extensive efforts to encourage the child's relationship with the grandparents, including (1) referring the family for twice-weekly video visits; (2) ensuring an appropriate

supervision level for the video visits; and (3) coordinating and funding the scheduled in-person visits.

¶ 23 Last, father claims, without providing factual support, that the Department was "never" going to provide services to assist the grandparents in becoming a placement because they lived outside of Colorado. He relies only on section 19-3-208(1), C.R.S. 2025, which provides that governments shall provide services to children in out-of-home placement and to "their families in the state of Colorado." But that statute is inapposite because it refers to "families" eligible for services "as determined necessary by an assessment and a case plan," *id.*, and the grandparents were not provided a case plan or a treatment plan. Nor does the statute prohibit a department from providing services to eligible families outside of Colorado. *See id.* Thus, we do not address this issue further. *See D.B-J.*, 89 P.3d at 531 (declining to address an appellate argument presented without supporting facts or specific argument).

¶ 24 Because the record supports the court's findings, we must affirm its determination. *See B.H.*, ¶ 80.

### III.  Disposition

¶ 25   The judgment is affirmed.

CHIEF JUDGE ROMÁN and JUSTICE MARTINEZ concur.